STATE OF NORTH CAROLINA v. LONZO M. CREWS, JR. AND PHILLIP EUGENE TURPIN

No. 55

(Filed 16 March 1979)

1. **Criminal Law § 92.5— defendants charged with same crimes—severance properly denied**

   The trial court did not err in denying defendants' motion for severance where they were tried for the murders of the same two people; neither defendant made an extrajudicial statement or confession that was introduced at trial; and neither showed any prejudice stemming from the joint trial.

State v. Crews

**2. Constitutional Law § 30 — defendant's half-brothers and half-sister — welfare files — disclosure properly denied**

In a prosecution for first degree murder where the evidence tended to show that one defendant's half-brothers and half-sister were present at the scene of the crimes, the trial court did not err in ordering that welfare department files concerning the half-brothers and half-sister not be released to defendants or the State, since the files in question were not in the prosecutor's possession, custody or control and therefore were not subject to discovery as a matter of right; almost all the material asked for was privileged under G.S. 8-53.3, as it consisted primarily of reports and test results on the children by practicing psychologists; and the trial court determined that disclosure of the files was not necessary to a proper administration of justice.

**3. Searches and Seizures § 15 — stolen vehicle — standing to challenge lawfulness of search**

Defendants had no standing to object to the search of a truck since the truck belonged to neither defendant but had been stolen by them, and in fact neither defendant was present at the time of the search.

**4. Criminal Law § 29.1 — request for psychiatric examination — denial proper**

The trial court did not abuse its discretion in denying one defendant's motion for a psychiatric examination where defendant had been in custody for over four months at the time he first requested the examination; no showing of any merit was made until the day of trial; defendant was present at his arraignment, entered a general plea of not guilty, and raised no question about his capacity to proceed at that time; and an affidavit filed by defendant's attorney in support of his motion was more an indication that defendant did not have cancer or a brain tumor which would affect his capacity to proceed than an indication that he did have such a malady.

**5. Constitutional Law § 30 — defendant's statement to third person — discovery not required**

The State was not required pursuant to G.S. 15A-903(a)(2) to disclose to defendant the substance of a statement allegedly made by him to a third person.

**6. Criminal Law § 57 — ballistics expert — granting of motion to suppress testimony — further evidence not prejudicial**

Defendant failed to show error in the trial court's allowing the State to examine a ballistics expert further on the comparison between two exhibits after the court had granted defendant's motion to suppress ballistics testimony, since defendant did not include the voir dire in the record and it was therefore impossible to determine what material the trial judge was excluding by his order to suppress; the testimony further elicited from the witness merely clarified his former statement; and the later testimony was in fact beneficial to defendant.

**7. Criminal Law § 86.4 — earlier warrant against defendant — inquiry for impeachment improper — error inconsequential**

Though the trial court erred in overruling defendant's objection to the State's question as to whether there was a warrant out against him for car

State v. Crews

larceny at an earlier time, such error was inconsequential in light of the overwhelming evidence of defendant's guilt.

Justice BROCK took no part in the consideration or decision of this case.

APPEAL by defendants from the judgment of *Thornburg, J.*, entered in the 24 October 1977 Criminal Session of MADISON County Superior Court. This case was docketed and argued during Fall Term 1978 as Number 3.

In indictments, proper in form, the defendants were each charged with the first degree murder of Bennie Hudgins and the first degree murder of Tommy Norton. They entered pleas of not guilty as to all the charges, which were consolidated for trial.

At trial the evidence for the State tended to show the following:

On 12 June 1977 Mrs. Evelyn Alemany, Lloyd Romero, age thirteen, Raymond Romero, age fifteen, Debbie Romero, age sixteen, and the two defendants were camping in some woods near Big Laurel River in Madison County. Mrs. Alemany is the mother of the three Romeros and defendant Turpin; the Romero children are the half-brothers and half-sister of defendant Turpin. Defendant Crews is unrelated to all the others.

These people came to Madison County in Mrs. Alemany's Buick with a U-Haul trailer attached to it. The car developed two flat tires, and on 12 June 1977 the defendants decided they had to leave the area. The defendants told Debbie Romero to go out to the highway and stop someone "and make sure there are no women in the car and . . . make sure there are only two people in the car." They told Debbie that if she did not, they would hurt Raymond or Lloyd. At that time both defendants had guns with them. Debbie stopped a pickup truck containing an elderly man and a young boy, but she became frightened and told them to keep going.

At defendants' suggestion, Lloyd Romero then went to the road, and a pickup truck containing Bennie Hudgins and Tommy Norton stopped. The boy told them his mother had two flat tires and asked if they could help. Lloyd got in the truck with the two men, and the three of them drove toward the camp site. Lloyd jumped out of the truck and hid next to the creek. He was scared

the men were going to be shot because of statements previously made by defendant Crews.

The defendants came out of the bushes and approached the truck. Defendant Crews yelled for the two men to get out and put their wallets on top of the truck. Tommy Norton complied. Bennie Hudgins refused, so defendant Crews shot him in the back, took Mr. Hudgins' wallet from his pocket and threw the body next to the creek. Mr. Hudgins died as a result of that wound.

Defendant Crews then told defendant Turpin to shoot Tommy Norton "and let's get out of here." Defendant Crews then returned to camp with the pickup truck. He told Mrs. Alemany, Debbie and Raymond to take the things out of the truck and throw them in the creek, which they did.

In the meantime, defendant Turpin and Tommy Norton were still up by the road. Tommy Norton was crying and begged defendant Turpin three times not to shoot him because he had children at home. Mr. Norton started running up a hill, and defendant Turpin shot him in the arm with a scope rifle. He fell, and defendant Turpin ran up to him and shot him in the head. Mr. Norton died from this head wound.

Defendant Turpin and Lloyd Romero returned to camp. Defendant Turpin stated that he did not shoot the second man because "he [defendant Turpin] didn't want us [Lloyd and Raymond Romero] to know that he was a killer." Lloyd Romero testified, however, that he actually saw defendant Turpin shoot Tommy Norton in the head.

Some gasoline was siphoned from the pickup truck and was sprinkled on Mrs. Alemany's car. The car was then set on fire. Defendant Crews had stated that he wanted this done "because he didn't want his fingerprints or anything there to show that he had been there."

Mrs. Alemany, the three Romero children and the two defendants all got in the pickup truck and drove to Dresden, Tennessee so that defendant Crews could visit with his family. Once there, defendant Crews decided to remain with his family, and Debbie Romero stayed with him. She claimed that she did not want to stay, but her family just left her there. Mrs. Alemany

testified that defendant Crews made Debbie Romero stay with him "to guarantee that I [Mrs. Alemany] kept my mouth shut."

After leaving defendant Crews and Debbie in Dresden, Tennessee, Mrs. Alemany, Lloyd and Raymond Romero and defendant Turpin began driving to California in Tommy Norton's pickup truck. On 14 June 1977 they were seen siphoning gas out of a church bus by Reverend Grant Atkinson in Cripple Creek, Colorado. The police were notified, and a chase ensued between the truck and the officers. Eventually the pickup truck was forced to stop near an open field, but no one was in it by the time the police arrived.

About an hour later the officers apprehended Mrs. Alemany, Raymond and Lloyd in a field near the truck. They informed the police there was a fourth occupant, defendant Turpin, who may be armed. Defendant Turpin was arrested one hour later after he was discovered riding in a red pickup truck that was stopped at a roadblock.

Mrs. Alemany and the two Romero boys told the officers in Colorado that the pickup truck they were riding in had been stolen. They also mentioned the murders that had occurred in North Carolina, although there was some question as to whether Tommy Norton had been killed or had gotten away. This information was relayed to Sheriff Ponder of Madison County, and the bodies of Bennie Hudgins and Tommy Norton were found that day.

The evidence for defendant Crews tended to show the following:

Seven members of defendant Crews' family testified to his good reputation in the Dresden, Tennessee community. His wife also testified to defendant Crews' good reputation at Fort Jackson, South Carolina and Fort Campbell, Kentucky, places he had been stationed in the Army.

Charlotte Crews, defendant Crews' wife, testified that she and defendant Crews got married in January, 1975, and he joined the Army in December of that year. They have a daughter who is fifteen months old. In the Spring of 1977 they were living at Fort Campbell. Mrs. Crews discovered that defendant Crews was hav-

ing an affair with Debbie Romero, so she left him and went to California.

Mrs. Kathleen Crews, defendant Crews' mother, testified that Mrs. Alemany and Debbie Romero had been to her home in Tennessee with defendant Crews two times before June of 1977. On one occasion Mrs. Crews told Mrs. Alemany that she "didn't approve" of her and asked her to leave.

On 13 June 1977 her son, defendant Turpin, Mrs. Alemany, Debbie Romero and the two Romero boys came to her house about 10:30 a.m. They stayed about one hour, and then all of them except Debbie and defendant Crews left. Mrs. Crews stated that she had told Mrs. Alemany Debbie could not stay there, and Mrs. Alemany replied that "she was going to leave her there anyway."

Defendant Crews' sister, Mrs. Elizabeth Poag, testified that she had discussed the events of 12 June 1977 with Debbie Romero. Debbie had told her that Debbie's brother had killed one of the men and her mother had killed the other.

Defendant Crews took the stand on his own behalf. He testified that on 12 May 1977 he went AWOL from the Army because "1 [defendant Crews] was depressed with the way the Army was treating me." He and Debbie Romero went to Dresden, Tennessee to get his car fixed. They returned to Fort Campbell, Kentucky, and the next day he, defendant Turpin, Mrs. Alemany, Debbie Romero and the two Romero boys left Kentucky. The two defendants were in defendant Crews' car, and the others were in Mrs. Alemany's Buick. They all went to Chicago to visit some of defendant Crews' relatives, and defendant Crews left his car with some cousins.

On 10 June 1977 Mrs. Alemany decided that the group would camp along Big Laurel River in Madison County. On Sunday, 12 June 1977 defendant Turpin and Mrs. Alemany got into an argument during breakfast. Mrs. Alemany broke a plate over her son's hand and threw a butcher knife at him.

That morning, about 11:00 a.m., defendant Crews left the camp site and sat down in the woods. He was thinking about his wife and child and about getting back to Fort Campbell. He heard some shots and thought someone was target shooting. As he

returned to the camp, he saw a roadblock and "thought I [defendant Crews] saw a body." At the camp he noticed the others taking things from the U-Haul trailer and putting them into the back of a pickup truck. After they were finished, Mrs. Alemany's car was set on fire, and all of them left in the truck.

Defendant Crews stated he never asked anyone what had happened or how the truck had gotten there. The first time he knew two men were killed was when he was arrested.

The group drove to Dresden, Tennessee, and defendant Crews decided to stay with his family. Debbie Romero also stayed because she wanted to go back to Fort Campbell with him and get a job. Defendant Crews denied ever having told Mrs. Alemany he would harm Debbie if her mother talked to the police, and there was no indication Debbie did not want to stay in Dresden or was doing so involuntarily.

Defendant Turpin presented no evidence.

The trial court charged the jury that they could find either or both defendants guilty of first degree murder, second degree murder or not guilty as to the deaths of Bennie Hudgins and Tommy Norton. The jury found both defendants guilty of two first degree murders. After hearing evidence concerning the sentencing of defendants, the jury recommended life imprisonment for each defendant. After an imposition of two consecutive life sentences for both defendants, they appealed to this Court.

Other facts relevant to the decision will be included in the opinion below.

*Jeff P. Hunt for defendant Crews.*

*Bruce Briggs for defendant Turpin.*

*Attorney General Rufus L. Edmisten by Associate Attorney Thomas H. Davis, Jr. for the State.*

COPELAND, Justice.

For the reasons stated below, we find no prejudicial error in defendants' trial.

This appeal concerns two defendants who submitted separate briefs to this Court. We will deal first with those assignments of

error brought forth by both defendants. We will then discuss the arguments made by defendant Turpin alone and those made by defendant Crews alone, in that order.

Both defendants claim the trial court erred in denying their motions for change of venue or, in the alternative, for a special venire to be summoned from outside Madison County. They based their motions primarily on the pretrial publicity of the crimes that was contained in local newspapers.

Before denying the motions, the trial judge heard arguments from the defendants and the State, and he studied defendants' written motions and the accompanying newspaper articles. The judge stated in his order that he would permit "full inquiry" of each prospective juror to determine whether he or she could give defendants "a fair and impartial trial based on the evidence." If there is any indication to the contrary, "the Court will at that time hear challenge for cause."

Defendants do not contend that any juror was impaneled who was biased or prejudiced in any way. They did not include any of the jury selection proceedings in the record.

> "Defendant's motion for a change of venue was addressed to the sound discretion of the trial court. Where the record discloses . . . that the presiding judge conducted a full inquiry, examined the press releases and the affidavits in support of the motion, and where the record fails to show that any juror objectionable to the defendant was permitted to sit on the panel, or that defendant had exhausted his peremptory challenges before he passed the jury, denial of the motion for change of venue was not error." *State v. Harding*, 291 N.C. 223, 227, 230 S.E. 2d 397, 400 (1976). (Citations omitted.) *See also State v. Harrill*, 289 N.C. 186, 221 S.E. 2d 325 (1976), death penalty vacated in 428 U.S. 904, 49 L.Ed. 2d 1211, 96 S.Ct. 3212 (1976).

This assignment of error is overruled.

[1] The defendants next argue that the trial court erred in denying their motions for severance. We do not agree.

Both defendants in this case were indicted and tried for the murders of Bennie Hudgins and Tommy Norton. "Ordinarily,

unless it is shown that irreparable prejudice will result therefrom, consolidation for trial rather than multiple individual trials is appropriate when two or more persons are indicted for the same criminal offense(s)." *State v. Jones*, 280 N.C. 322, 333, 185 S.E. 2d 858, 865 (1972).

The most common reason for requesting a separate trial is that one defendant has made an extrajudicial statement that would implicate and prejudice the other defendant should the State offer it into evidence at defendants' joint trial. *See State v. Pearson*, 269 N.C. 725, 153 S.E. 2d 494 (1967). *See also Bruton v. United States*, 391 U.S. 123, 20 L.Ed. 2d 476, 88 S.Ct. 1620 (1968). In this situation, the State must choose between not using the statement at defendants' joint trial, deleting from the one defendant's out-of-court statement all references to the other defendant(s) or trying the defendants separately. G.S. 15A-927(c).

In this case neither defendant made an extrajudicial statement or confession that was introduced at trial, and neither defendant has shown any prejudice stemming from the joint trial. The question whether to try defendants together or separately is directed to the sound discretion of the trial court. Its ruling will not be disturbed on appeal unless the defendant can show the consolidation deprived him of a fair trial. *See, e.g., State v. Smith*, 291 N.C. 505, 231 S.E. 2d 663 (1977). This assignment of error is overruled.

[2] For many years defendant Turpin and the Romero children had been connected with the child welfare division of the San Francisco Department of Social Services. The defendants subpoenaed Ms. Lorraine Costellano Cocke personally from the San Francisco Department of Social Services and requested access to that agency's files through a *subpoena duces tecum*. Ms. Cocke appeared in court with the records and documents on defendant Turpin and the Romero children; however, she was instructed by the San Francisco city attorney not to make them available to anyone unless and until the trial judge inspected them and ordered them released.

The defendants asked the trial judge to conduct an *in camera* inspection of the files and "to release such paper writings to the Defendant Turpin and the Defendant Crews for such purpose and such use as they may be in the defense of these two cases." The

judge did examine the files, and he ordered that they not be released to either the defendants or the State. He then sealed and forwarded them to this Court for review of his ruling.

The defendants also made motions for pretrial discovery of files and reports concerning mental or physical examinations conducted on Lloyd and Raymond Romero. These documents were in the custody of the Blue Ridge Community Mental Health Center in Asheville and the Madison County Department of Social Services. The trial judge also inspected these documents *in camera.* He allowed defendants' motions in part and denied them in part, ordering that copies of certain reports be furnished to both the defense and the State. The records were sent to this Court for our use in reviewing this matter.

The defendants claim the trial court erred in denying them access to all the requested material. We do not agree.

None of the documents and reports in question were within the prosecutor's possession, custody or control; therefore, they were not subject to discovery as a matter of right under G.S. 15A-903(d)[1] or G.S. 15A-903(e).[2] "Within the possession, custody, or control of the State" as used in these provisions means within the possession, custody or control of the prosecutor or those working in conjunction with him and his office. This interpretation is necessary when one considers that in this case the district attorney had neither the authority nor the power to release the requested material to the defendants and, in fact, he was also denied access to the information.

---

1. G.S. 15A-903(d) Documents and Tangible Objects.—Upon motion of the defendant, the court must order the solicitor to permit the defendant to inspect and copy or photograph books, papers, documents, photographs, motion pictures, mechanical or electronic recordings, tangible objects, or copies or portions thereof which are within the possession, custody, or control of the State and which are material to the preparation of his defense, are intended for use by the State as evidence at the trial, or were obtained from or belong to the defendant.

2. G.S. 15A-903(e) Reports of Examinations and Tests.—Upon motion of a defendant, the court must order the prosecutor to provide a copy of or to permit the defendant to inspect and copy or photograph results or reports of physical or mental examinations or of tests, measurements or experiments made in connection with the case, or copies thereof, within the possession, custody, or control of the State, the existence of which is known or by the exercise of due diligence may become known to the prosecutor. In addition, upon motion of a defendant, the court must order the prosecutor to permit the defendant to inspect, examine, and test, subject to appropriate safeguards, any physical evidence, or a sample of it, available to the prosecutor if the State intends to offer the evidence, or tests or experiments made in connection with the evidence, as an exhibit or evidence in the case.

State v. Crews

Almost all the material asked for was privileged under G.S. 8-53.3[3] had the Romero children been given the chance to assert the privilege. It consisted primarily of reports and test results on the children by practicing psychologists. The trial judge examined the documents in detail and refused to release them to either the defendants or the State. Under the proviso in G.S. 8-53.3, the judge clearly could have compelled disclosure "if in his opinion the same is necessary to a proper administration of justice." His refusal to do so in this case was not error.

Furthermore, the defendants admit that the trial court issued them copies of some of the requested matter; however, the record does not inform this Court which material they were given. This information should have been included in the record as it was necessary for our understanding of defendants' assignment of error. *See* Rule 9(b)(3) of North Carolina Rules of Appellate Procedure.

[3] Defendant Turpin argues that the guns seized from Tommy Norton's truck in Colorado should have been excluded from evidence at trial because the search of that vehicle was unconstitutional. This contention is without merit.

At defendant Turpin's request, the trial judge conducted a *voir dire* concerning the search in question. He found that the search was lawful and reasonable and that neither defendant had standing to object to the search. We agree with both conclusions; however, we need only discuss the standing question.

The vehicle that was searched in this case belonged to neither defendant, and in fact neither defendant was present at the time of the search. Defendant Crews was in Tennessee with his family and Debbie Romero. Defendant Turpin had fled from the vehicle after being chased by Colorado authorities; he was somewhere at large at the time. The search was conducted after Mrs. Alemany and Lloyd and Raymond Romero had been arrested and after they had told the officers there were several weapons in the truck.

---

3. G.S. 8-53.3 Communications between psychologist and client.—No person, duly authorized as a practicing psychologist or psychological examiner, nor any of his employees or associates, shall be required to disclose any information which he may have acquired in rendering professional psychological services, and which information was necessary to enable him to render professional psychological services: Provided, that the presiding judge of a superior court may compel such disclosure, if in his opinion the same is necessary to a proper administration of justice.

The United States Supreme Court recently addressed the issue of standing to object to a search in *Rakas v. Illinois*, --- U.S. ---, 58 L.Ed. 2d 387, 99 S.Ct. 421 (1978). The Court again emphasized that " 'wrongful' presence at the scene of a search would not enable a defendant to object to the legality of the search," and it noted that some lower courts have erroneously allowed a person in a stolen automobile to object to the search of that vehicle. Id. at ---, 58 L.Ed. 2d at 399-400 n. 9, 99 S.Ct. at 429 n. 9. The *Rakas* decision made it clear that a person can object to a search only if he has "a legitimate expectation of privacy in the invaded place," which means, *inter alia*, an expectation of privacy that society will recognize. Id. at ---, 58 L.Ed. 2d at 401 n. 12, 99 S.Ct. at 430-31 n. 12. Previous possession of a stolen vehicle cannot constitute the basis for a legitimate expectation of privacy; therefore, this assignment of error is overruled.

[4] The defendants' trial was set for 24 October 1977. On 10 October 1977 Judge Thornburg allowed defendant Turpin's request for a pretrial psychiatric examination. On 19 October 1977 defendant Crews made a motion for a pretrial psychiatric examination; however, the only reason stated for the request was that the defendant was charged with a capital crime. The motion was denied because "the Court finds nothing in the motion that would constitute a reasonable ground for allowing the requested examination."

On 24 October 1977, the day of trial, defendant Crews renewed his motion. At this time an affidavit by defendant Crews' attorney was submitted to the trial court stating that defendant Crews' mother and wife had told him that the defendant may have cancer or a brain tumor. According to the affidavit, a doctor at Fort Campbell, Kentucky had mentioned this possibility to defendant Crews' wife. The affidavit went on to state, however, that "the Defendant had no knowledge of having such a malady as cancer, or a brain tumor, and that he had never received any X-rays of the head and had never been treated for a brain tumor or cancer of the head," although defendant Crews had suffered from extreme headaches over the past four years. Moreover, two of defendant Crews' commanding officers at Fort Campbell had been contacted by the attorney. Neither of them had heard "anything at all" about defendant Crews' possible condition, and

both stated that they "would have expected to have been informed" if such had been the case.

We have stated that a defendant does not have an automatic right to a pretrial psychiatric examination and that the resolution of this matter is within the trial court's discretion. *State v. Washington*, 283 N.C. 175, 195 S.E. 2d 534 (1973), *cert. denied* 414 U.S. 1132, 38 L.Ed. 2d 757, 94 S.Ct. 873 (1974). *See also* G.S. 15A-1002(b).

Defendant Crews had been in custody for over four months at the time he first requested a pretrial psychiatric examination, and no showing of any merit was made until the day of trial. He was present at his arraignment and entered a general plea of not guilty; he did not raise any question about his capacity to proceed at that time. The affidavit in support of the motion was more an indication that defendant Crews did *not* have cancer or a brain tumor than that he did. Under these circumstances, the trial court did not abuse its discretion in denying defendant Crews' request. This assignment of error is overruled.

[5] In his next assignment of error defendant Crews contends the trial court erred by allowing Debbie Romero to testify as to his statement to her that he had shot Bennie Hudgins. He claims that the State was required to disclose to him the substance of this statement pursuant to his request for voluntary discovery of "all oral statements made by the defendant which the state intends to offer in evidence, as provided by G.S. 15A-903(a)(2)." We do not agree.

According to the official commentary accompanying it, Article 48 of the North Carolina General Statutes, dealing with pretrial discovery, was modeled after a draft of proposed amendments to Rule 16 of the Federal Rules of Criminal Procedure. *See also State v. Hardy*, 293 N.C. 105, 235 S.E. 2d 828 (1977). Federal Rule 16(a)(1)(A) expressly deals with this problem by stipulating that a defendant may discover "the substance of any oral statement which the government intends to offer in evidence at the trial made by the defendant whether before or after arrest *in response to interrogation by any person then known to the defendant to be a government agent*." (Emphasis added.) Although

G.S. 15A-903(a)(2)[4] does not include the language in Federal Rule 16(a)(1)(A) emphasized above, we find the intent of the Legislature was to restrict a defendant's discovery of his oral statements to those made by him to persons acting on behalf of the State.

The official commentary to G.S. 15A-903 relates that a provision requiring disclosure to a defendant of the names and addresses of witnesses to be called by the State was omitted from Article 48 because the witnesses may be subject to "harassment or intimidation." We agree with the opinion of the Attorney General that "[i]t would be illogical to assume the Act intended to require discovery of remarks of the defendant to bystander witnesses but not disclosure of the witnesses' names." 45 N.C.A.G. 60 (1975). "Where possible, the language of a statute will be interpreted so as to avoid an absurd consequence." *State v. Hart*, 287 N.C. 76, 80, 213 S.E. 2d 291, 295 (1975). Furthermore, it is anomalous to think the Legislature granted a defendant indirect access to the names of the State's witnesses when it denied his right to this information directly.

We have found no case in North Carolina in which an oral statement by a defendant to a third party witness was disclosed to him pursuant to G.S. 15A-903(a)(2). In fact, the interpretation urged by defendant Crews was apparently not contemplated when Chief Justice Sharp, speaking for this Court, stated that "defense counsel would be well advised to specifically request the defendant's oral statements when, as here, the client informs him *he has talked to the officers*." *State v. Stevens*, 295 N.C. 21, 37, 243 S.E. 2d 771, 781 (1978). (Emphasis added.) This assignment of error is overruled.

[6] State's Exhibit Number 11 consisted of metal fragments that had been removed from the body of Bennie Hudgins. Mr. Robert Cerwin, a special agent in the ballistics section of the North Carolina State Bureau of Investigation, testified for the State. He had examined State's Exhibit Number 11 and State's Exhibit Number 15, the 30-30 rifle that had been seized from Tommy Nor-

---

4. G.S. 15A-903. Disclosure of evidence by the State—information subject to disclosure.—(a) Statement of Defendant.—Upon motion of a defendant, the court must order the prosecutor:

*   *   *

(2) To divulge, in written or recorded form, the substance of any oral statement made by the defendant which the State intends to offer in evidence at the trial.

ton's truck by law enforcement officers in Colorado, to determine whether the bullet fragments had been fired by that rifle. The witness was accepted by the court as an expert in ballistics and firearm identification. He testified that State's Exhibit Number 11 could possibly have been fired from a 30-30.

A *voir dire* was then conducted, and the trial court ruled that "as to any further testimony concerning the bullet fragments previously identified as State's Exhibit 11, any further testimony by this witness, the motion to suppress is allowed, the evidence remains in as previously admitted; however, and the Court does not alter its ruling in that respect." The following exchange on direct examination then took place before the jury:

"Q. Mr. Cerwin, were the jacketing in the State's Exhibit 11 sufficiently large and intact to make a fair comparison with State's Exhibit 15?

OBJECTION.

OVERRULED.

A. (The witness did not respond.)

Q. Mr. Cerwin, 15 is the 30-30.

A. Yes, sir did I make a comparison with State's Exhibit —

Q. Was it sufficiently large jacketing, State's Exhibit 11, for you to make a fair comparison to determine whether or not it was fired by State's Exhibit 15?

A. Yes, I did, sir.

OBJECTION and MOTION TO STRIKE.

DENIED.

Q. Was it sufficiently intact and large enough for you to form an opinion as to whether State's Exhibit 15 discharged State's Exhibit 11?

OBJECTION.

OVERRULED.

A. Oh no sir not for a positive comparison, sir, due to the deformity on State's Exhibit 11, sir."

On cross-examination of this same witness, Mr. Cerwin reiterated that he "could not make a positive comparison between Exhibit 11 and Exhibit 15, due to the deformity of the jacket."

Defendant Crews argues the trial court erred in allowing the State to examine the witness further on the comparison between the two exhibits.

The record does not set forth the *voir dire* proceeding on this matter; therefore, we cannot determine what material the trial judge was excluding by its order. The ruling did specify, however, that the evidence on this question that had already been admitted was to remain in evidence. The testimony further elicited from Mr. Cerwin merely clarified his former statement that State's Exhibit Number 11 "is a deformed copper jacket bullet, it possibly could be from a 30-30." In fact, it appears that Mr. Cerwin's later testimony was beneficial to defendant Crews because the witness then made it perfectly clear that a positive comparison could not be made. This assignment of error is overruled.

[7] Defendant Crews testified at trial. During cross-examination, and over his objection, the State asked whether there was a warrant out against him for car larceny when he left Kentucky. Defendant Crews claims the trial court erred in overruling his objection to this question.

In *State v. Williams*, 279 N.C. 663, 185 S.E. 2d 174 (1971), this Court held that "*for purposes of impeachment*, a witness, including the defendant in a criminal case, may *not* be cross-examined as to whether he has been *accused*, either informally or by affidavit on which a warrant is issued, of a criminal offense unrelated to the case on trial." *Id.* at 672, 185 S.E. 2d at 180. (Emphasis in original.) The trial judge should have sustained defendant Crews' objection; however, we find that this error does not constitute a sufficient basis for a new trial. Defendant Crews responded that he knew of no such warrant, and no further inquiry was made by the State. In light of the overwhelming evidence of defendants' guilt, this error was inconsequential. *See State v. Gainey*, 280 N.C. 366, 185 S.E. 2d 874 (1972).

We have examined all other assignments of error defendants brought forward to this Court and find them to be without merit.

For the foregoing reasons, we find that defendants had a trial free from prejudicial error.

No error.

Justice BROCK took no part in the consideration or decision of this case.