STATE OF NORTH CAROLINA v. JOHN WILLIAM ROOK

No. 2

(Filed 3 November 1981)

**1. Criminal Law § 76.7— confession—voir dire hearing—sufficiency of evidence to support findings**

The evidence in a voir dire hearing to determine the admissibility of defendant's confession supported findings by the trial court that an officer called defendant a liar and then read a warrant to defendant charging him with murder, and the court did not err in failing to find that the officer also told defendant he had "good evidence" against him where the evidence on that point was conflicting. Furthermore, the evidence also supported findings by the court that an officer spoke to defendant in a loud but not an angry or threatening tone of voice, that an officer advised defendant that neither he nor another officer could help him and that the only thing that could help him was to tell the truth, and that no officer made any offer to help defendant with the district attorney or with his alcoholic or drug problems if he would confess.

**2. Criminal Law § 76.10— confessions—conduct of officers—voluntariness—question of law**

Whether the conduct and language of investigating officers amounted to such threats or promises or influenced the defendant by hope and fear as to render a subsequent confession involuntary is a question of law reviewable on appeal.

**3. Criminal Law § 75.5— confessions—Miranda warnings—test of voluntariness**

Even where the procedural safeguards required by *Miranda v. Arizona*, 384 U.S. 436, are recited by officers and defendant signs a waiver stating that he understands his constitutional rights, including his right to counsel, the ultimate test of the admissibility of a confession still remains whether the statement made by the accused was in fact voluntarily and understandingly given.

**4. Criminal Law § 75.2— confession not induced by offer of help—sufficiency of evidence and findings**

The evidence on voir dire supported the trial court's determination that defendant's confession to a murder was not induced by an offer of help to keep defendant from receiving the death penalty so that he would be sent to prison where he would receive help for his drinking and drug problems and that the confession was voluntarily and understandingly made.

**5. Criminal Law § 75.2— confessions—promises of collateral advantage**

Any statements by officers concerning help for defendant with regard to defendant's drinking and family problems related to matters entirely collateral to the criminal charges against him and would not render defendant's confession involuntary.

**6. Searches and Seizures § 20— requisites of affidavit for search warrant**

A search warrant cannot be issued upon affidavits which are purely conclusory and which do not state underlying circumstances upon which the affiant's belief of probable cause is founded; there must be facts or circumstances in the affidavit which implicate the premises to be searched.

**7. Searches and Seizures § 23— sufficiency of affidavit for search warrant**

An officer's affidavit was sufficient to support issuance of a warrant to search the trailer in which defendant lived for "a wooden club or instruments that could be used as a club, bloody clothing, and other instrumentalities" of a "rape, kidnapping, murder" where the affidavit alleged sufficient facts and circumstances to establish probable cause to believe that a "wooden club or instruments that could be used as a club" and "bloody clothing" constituted evidence of the crimes being investigated, that a club, or an object appearing to be a club, was in the possession of defendant and was used as an instrumentality in committing the crimes being investigated, and that "bloody clothing" would constitute evidence of the offenses committed or would reveal the identity of a person participating in those offenses, and where the affidavit alleged sufficient facts and circumstances to establish reasonable cause to believe that the club-like object and the bloody clothing would be found on the premises to be searched.

**8. Constitutional Law § 80; Criminal Law § 135.4; Homicide § 31.3— death penalty—list of aggravating circumstances—constitutionality**

The aggravating circumstances listed in the death penalty statute, G.S. 15A-2000(e), are not so vague as to violate due process or to allow a jury arbitrarily and capriciously to impose the death penalty.

**9. Criminal Law § 135.4— death penalty—especially heinous, atrocious or cruel murder—constitutionality of statute—sufficiency of evidence**

The "especially heinous, atrocious or cruel" aggravating circumstance listed in G.S. 15A-2000(e)(9) is not unconstitutionally vague where it has been judicially construed to apply only to a "conscienceless or pitiless crime which is unnecessarily torturous to the victim." Furthermore, such aggravating circumstance was properly submitted to the jury in this first degree murder case where the evidence showed an aggravated battery of the victim amounting to torture which necessarily caused her great physical pain and emotional distress.

**10. Homicide § 21.5— first degree murder—theory of premeditation and deliberation—sufficiency of evidence**

Submission of a charge of first degree murder to the jury under the theory of premeditation and deliberation was not improper because the State introduced a confession containing defendant's statements that he did not mean to strike the victim with a knife or to run over her with a car where (1) submission of the first degree murder charge under the theory of premeditation and deliberation was supported by evidence that defendant obtained a tire tool from the trunk of a vehicle because the victim was resisting defendant's sexual advances, defendant deliberately struck the victim with the tire tool in the head area prior to sexually assaulting her and continued to beat her

State v. Rook

thereafter, and the injuries to the head area significantly contributed to the victim's blood loss and ultimate death; (2) defendant's statement that he did not mean to strike the victim with the knife was contradicted by competent circumstantial evidence; and (3) physical evidence at the crime scene contradicted defendant's assertion that he did not mean to run over the victim with the car.

11. **Criminal Law §§ 135.4, 138.4— first degree murder—premeditation and deliberation and felony murder theories— underlying felony as aggravating circumstance—punishment for underlying felony**

Where defendant was found guilty of first degree murder on both premeditation and deliberation and felony murder theories, the trial court properly submitted the underlying felony of rape as an aggravating circumstance, and the court could impose additional punishment for the rape.

12. **Criminal Law § 135.4; Homicide § 31— death penalty—written findings as to mitigating circumstances not required**

The trial court did not err in permitting the jury to return its recommendation for a sentence of death in a first degree murder case without requiring the jury to indicate in writing its finding as to each mitigating circumstance submitted to it, since there is no statutory or constitutional requirement of specific findings on mitigating circumstances. Furthermore, defendant was not prejudiced by failure of the trial court to require the jury to specify the mitigating factors it found to exist where the Supreme Court could not conclude that the death sentence was arbitrary, excessive or disproportionate even if the jury accepted as true all sixteen mitigating circumstances submitted to it.

13. **Criminal Law § 135.4— death penalty not disproportionate or excessive**

Imposition of the death penalty for first degree murder was not disproportionate or excessive, considering the crime and the defendant, where the evidence showed that defendant beat the victim viciously with a tire tool, repeatedly cut her with a knife, raped her, ran over her battered body with an automobile and left her to bleed to death in a lonely field.

Justice EXUM concurring in part and dissenting in part.

APPEAL from judgments entered by *Clark, Judge*, at the 6 October 1980 Criminal Session of Superior Court, WAKE County. Defendant was convicted by a jury of first degree rape, kidnapping, and first degree murder. For his conviction of first degree murder, defendant was sentenced to death. Defendant received consecutive life sentences for the crimes of kidnapping and first degree rape. From all these judgments, defendant appeals to this Court as a matter of right.

*Attorney General Rufus L. Edmisten, by Assistant Attorney General J. Michael Carpenter, for the State.*

*C. D. Heidgerd and J. Franklin Jackson for the defendant.*

CARLTON, Justice.

Defendant brings forth assignments of error relating to several pre-trial matters, an alleged error in the guilt determination phase of his trial and several alleged errors relating to the sentencing phase of his trial. After a careful consideration of these assignments, as well as the record before us, we find no error in any of these proceedings and affirm.

I.

At trial, evidence for the State tended to show that at approximately 7:20 p.m. on 12 May 1980, Ann Marie Roche, a registered nurse, was walking home on Avent Ferry Road. She was clad in a T-shirt and blue jeans, was wearing glasses and was carrying a brown gym bag. As she was nearing the Lake Raleigh Road intersection defendant, who was driving a Mercury automobile borrowed from his neighbor, turned left onto Lake Raleigh Road and blocked her path. Defendant beckoned Ms. Roche and she approached his car. The two talked for several minutes and then began arguing and, within seconds, defendant began to beat her.

All of this was observed by Howard B. Harris, Jr., who lived on Avent Ferry Road, and George Edward Schlager, who was jogging by. Mr. Schlager approached the car just as defendant was beating Ms. Roche. Ms. Roche was on the ground with her back against the driver's door. Her face and arms were cut and bleeding, and defendant was crouching over her, armed with a stick or some other object about one or two inches in diameter. Mr. Schlager asked if he could help and defendant stood and replied, "just go on, man, this doesn't concern you." Mr. Schlager then saw Mr. Harris and went to confer with him. Both saw the car leave with Ms. Roche in the passenger seat, with her head down, crying. Mr. Schlager jogged toward the car and observed the license number, RAP-980. He wrote the number on a matchbook and gave a copy of it to Mr. Harris.

Two other persons, Donna Atkins and Pamela Dodd, observed the struggle between Ms. Roche and her assailant. Ms. Atkins positively identified defendant as the assailant. Ms. Dodd observed a man beating a young woman. She testified:

> I saw a guy over the front seat beating a girl brutally. The steering wheel appeared to jar at times he was beating her so hard. Then they were out of the car. He was swinging her around by the hair on the ground once that I can remember. At that time I ran in the house and called the police.

Although Ms. Dodd did not positively identify the assailant as the defendant, her description of the assailant matched that of the defendant.

Officer Ronnie Holloway arrived in the area at approximately 7:30 p.m. in response to the calls. Although he patrolled the area, he could not find the car.

On 13 May 1980 at approximately 7:30 p.m., Norman Cash, a patrol officer with Dorothea Dix Hospital, was on routine patrol in the area just south of Lake Raleigh. In a large, open field he discovered a pile of clothing and a billfold. A short distance away, he observed a body and notified the Wake County Sheriff's Department. Deputy Pickett of the Wake County Sheriff's Department was called and he, too, observed the body. At 8:45 p.m., Officer William E. Hensley, a crime scene specialist, was called to the scene. He observed a white female body, badly bruised and battered, with cuts and abrasions. The ground around the body was covered with blood. The body was nude and was approximately thirty-five feet from the pile of clothing. A T-shirt, blue jeans and glasses were recovered as well as other articles including a brown bag. The body was identified as Ann Marie Roche.

From the license number recorded by Mr. Schlager the police were able to trace the car and locate the owner. On 15 May 1980, Officer Holloway went to Stovall Drive and found the car in question. Surveillance was set up and the car was subsequently stopped by officers. It was operated by Ms. Edwards, the owner, who told the police that defendant had borrowed her car on the evening of 12 May 1980. She told police that when he borrowed the car, defendant was dressed only in blue jeans, was barefooted,

and had pulled his hair back in a pony tail. This description matched that given by all the witnesses to the assault. Surveillance of the area continued and the defendant was observed entering a trailer near where the car was parked. Raleigh police officers approached the trailer, knocked on the door, and were told to enter. Inside were two white males, two white females and a small child. Sergeant G. W. Black requested permission to search for defendant and this was denied. Shortly thereafter, however, the defendant came from the hallway of the trailer and stated, "I guess I'm the one you're looking for." Defendant was then taken into custody and placed in a patrol car.

On 15 May 1980, Deputy Sheriff P. J. Bissette obtained a search warrant to search the trailer where defendant had been arrested and conducted a search. During the search, Officer Bissette found and seized a pair of blood-stained blue jeans. Officer Hensley, who assisted in the search, found a Rapala Finland knife and a leather carrying case on the dash of a vehicle parked in front of the trailer. He then inspected the Mercury vehicle which had been taken to the Wake County Courthouse and found fresh stains on the driver's side as well as grass caught between certain sections of the vehicle. He observed red stains on the hubcaps and underneath the vehicle. During the autopsy of Ms. Roche, Officer Hensley observed an unusual circular impression, approximately five centimeters in size, on the right hip. He noted a corresponding five centimeter area in the chassis of the Mercury automobile.

S.B.I. agent Mark Nelson came to the crime scene on the evening of 13 May at approximately 11:30 p.m. He made numerous tests and observations and stated his opinion that one particular bloody smear was consistent with the large bloody object, like a body, being rolled or dragged down the slope of the field. He also examined the Mercury automobile and found blood in numerous places. He also performed tests on the vaginal and anal smears taken from Ms. Roche's body and found the presence of sperm.

Dr. Dana D. Copeland, a pathologist, conducted the autopsy on Ms. Roche on 14 May 1980. He observed cuts on the front part of her body, all parallel. The cuts were straight across and were of a uniform, shallow depth. The placement and uniform depth, in

Dr. Copeland's opinion, indicated that the cuts had been made deliberately shallow and "with some care and effort." His conclusion was that Ms. Roche's cuts were caused by a sharp instrument like a knife. Dr. Copeland found numerous lacerations on her head and hands which were, in his opinion, produced by beating with a long, blunt instrument with a round striking surface. In addition to the numerous cuts and abrasions throughout Ms. Roche's body, her left leg was completely fractured and broken at the top. The pelvis was fractured and separated. Compression injuries in the pelvic region were consistent with her having been struck by an automobile. Severe internal bleeding had taken place and he found injuries in the vaginal area which, in his opinion, could have been produced by forcible sexual intercourse. Her right rib was also broken. In Dr. Copeland's opinion, Ms. Roche died as a result of loss of blood from the injuries she sustained. Moreover, his opinion was that she could have remained alive from a period of two hours up to a maximum of twenty-four hours after receiving the injuries observed.

At approximately 8:12 p.m. on 15 May 1980, Deputies Freddie Benson and Ted Lanier and Detective J. C. Holder of the Raleigh Police Department began interviewing the defendant. Deputy Benson advised defendant of his *Miranda* rights and defendant signed a waiver of rights form. Defendant stated that he understood his rights. Deputy Benson left the room and Detective Holder began to question defendant. He again advised defendant of his rights and defendant was calm and in control. Detective Holder testified that "Johnny looked at me, and he said that he did it. He asked me if I was happy. I told him that I was not happy. I said, 'What did you do.' He said that he killed that girl." Defendant then proceeded to give Officers Holder and Lanier a complete statement.

Defendant's statement to the officers can be summarized as follows: On 12 May 1980 he was at a cookout on Stovall Drive and needed more beer. He borrowed the Mercury from Ms. Edwards and drove to the A & P Store on Western Boulevard where he purchased a bag of charcoal. Upon leaving the store he got into a fight with a black person and ran and hid until they left. He then went to an apartment complex on Avent Ferry Road and removed some money from the coin-operated laundry machines. As he drove down Avent Ferry Road he saw Ms. Roche walking and

blew his horn. She waved, and he turned into the first dirt road, backed and turned, and sat headed toward Avent Ferry Road to await the girl. When Ms. Roche walked up to the car, he pinched her. She slapped him, and they began scuffling. He then apologized, and she said he had already hurt her arm. He asked her to go riding with him and she got into the car. A jogger came up during the scuffle and defendant told the jogger to keep his eyes on what he was doing. He and Ms. Roche then drove down Avent Ferry Road headed south and, after making a few turns, they eventually reached a wheat field. Defendant told her to get out of the car and "tried to get into her pants." She resisted, and he told her he was going to have to get his "damn gun" from the vehicle, although, in fact, he did not have one. Defendant got a tire tool out of the trunk of the car, and Ms. Roche removed her pants. As she did so, he struck her on the side of the head and she fell to the ground. He then had forcible sexual intercourse with her. She tried to pull his hair, and he began to hit her some four or five times on the head and got blood on his face, shoulder, wrist and pants. According to defendant, he swung his knife at her and cut her on the face and neck, but he didn't mean to cut her. He then attempted anal intercourse, and when she resisted, he hit her again, and, instead of fighting, she just laid there bleeding. Defendant then got into his car and drove down to turn around. He could barely see over the steering wheel, but knew he had run over her with the car because he heard a thump and the car got stuck. He spun the tires to free the car and then drove home. When he arrived, the police were at the trailer. He returned to the cookout and explained the blood on his clothing and body as the result of the fight at the A & P.

At approximately 10:26 p.m. on 15 May 1980, defendant consented to a taped interview. Prior to this taking place, Officer Holder again advised defendant of his rights and defendant again repeated essentially the confession summarized above. Later that evening, defendant accompanied Detective Holder and other officers to the crime scene and showed them various items involved in the crime.

Defendant offered no evidence during the guilt determination phase of the trial.

Upon receiving the jury verdict finding defendant guilty of first degree murder, first degree rape, and kidnapping, the court

convened the sentence determination phase of the trial before the same jury. The State offered no evidence during this phase, choosing to rely instead upon the evidence introduced at the guilt determination phase. The defendant presented evidence through his brother and sister, who described in detail their life with their parents. Their parents were violent and constantly drunk and beat their children frequently. Their father spent time in prison, and the children were placed in foster homes. Defendant was forced to begin drinking by his father before he was ten years of age and would get "stone-drunk." Defendant became a heavy drinker and drug user.

Dr. Bob Rollins, a specialist in forensic psychiatry, examined defendant and diagnosed defendant as having a mental disorder of emotionally unstable personality as a result of experiences during his formative years. Dr. Rollins also testified that defendant was able to proceed to trial in that he understood his legal situation and was able to cooperate with his lawyer. Dr. Rollins felt that defendant understood what he was charged with, the different pleas he might make and the possible consequences of the situation. He further testified:

> Mr. Rook just has never been able to make a satisfactory adjustment out in society, not been able to get along with people. He's been involved in violence, the longest he had ever been employed is three weeks; he can't get along with his own family, with his wife, or with anybody. He just doesn't have the capacity to do that.

It was also Dr. Rollins's opinion that defendant associates sexual gratification with violence and aggressive acts and is sexually excited by violence and aggression. His opinion was that defendant, to some extent, "enjoys inflicting pain on other people." Dr. Rollins was of the opinion that defendant would not benefit from psychiatric treatment and believed that defendant's conduct would continue in the future in a manner similar to that of the past if he were to go free. In Dr. Rollins's opinion, defendant, at the time of the crime, was aware that what he was doing was wrong and that he would be held responsible for his actions. Chief District Court Judge George F. Bason of the Tenth Judicial District testified that during the years Mr. Rook was involved in the juvenile courts, no beneficial program was available to help him.

Dr. Seymour Halleck, a psychiatrist, testified that defendant's brutality probably resulted from his exposure to brutality himself as a child. He also testified that defendant suffered a mental illness although he was not insane. He stated:

I base my opinion on the fact that anybody that uses as much alcohol and as many drugs as he has and who has this kind of history of so much deprivation, so little moral or social learning, but I'm primarily based it on the drug issue, anybody who uses these drugs cannot exercise rational judgment, anybody with a degree of alcoholism found in this family as the disease, this kind of alcoholism is definitely a disease.

Dr. Halleck agreed with Dr. Rollins that defendant would not benefit from psychiatric treatment for any brief period of time.

At the conclusion of the testimony, the trial court instructed the jury on the sentencing phase. Three aggravating circumstances were submitted to the jury: (1) whether the murder was committed while defendant was engaged in the commission of the rape of the victim; (2) whether the murder was committed while the defendant was engaged in the commission of the kidnapping of the victim; and (3) whether the murder was especially heinous, atrocious or cruel. Sixteen mitigating circumstances were submitted to the jury.[1] The jury found beyond a reasonable

---

1. The mitigating circumstances submitted to the jury were:

(1) That this murder was committed while John William Rook was under the influence of mental or emotional disturbance.

(2) The capacity of John William Rook to appreciate the criminality of his conduct or to conform his conduct to the requirements of the law was impaired.

(3) The age of John William Rook at the time of this murder is a mitigating circumstance.

(4) John William Rook, in his formative years, was subjected to cruelty and physical abuse by his parents.

(5) John William Rook, in his formative years, was subjected to mental abuse by his parents.

(6) John William Rook, in his formative years, was subjected to emotional abuse by his parents.

(7) John William Rook has been a loving and affectionate husband to his wife.

doubt each of the aggravating circumstances and that the aggravating circumstances were sufficiently substantial to call for the imposition of the death penalty. The jury also found one or more mitigating circumstances, although it did not designate which of the sixteen were found, and then found beyond a reasonable doubt that the aggravating circumstances outweighed the mitigating circumstances. The jury then returned a recommendation that the death penalty be imposed, and the court entered judgment imposing the death penalty for the crime of first degree murder. Defendant also received consecutive life sentences for the crimes of kidnapping and first degree rape. From these judgments, defendant appealed of right to this Court.

## II.

### PRE-TRIAL PHASE

Prior to trial, defendant entered several motions which were denied by the trial court. The denial of these motions provides the basis for four of defendant's primary contentions on this appeal. He first contends that the trial court erred in denying his motion to suppress custodial statements because the findings of fact of the trial court in the order were not supported by suffi-

---

(8) John William Rook has been loving and affectionate to his brothers and sisters and their children.

(9) John William Rook is an alcoholic.

(10) John William Rook is an abuser of drugs and is addicted to drugs.

(11) John William Rook was sexually abused by an older man whom he lived with when he was 10 years old in order to have a more stable home environment.

(12) John William Rook had a deprived and chaotic childhood in which he was schooled in violence and criminality by his parents.

(13) John William Rook now has an IQ of 71 and received very little education in his formative years.

(14) John William Rook, in his formative years, received very little religious and moral training.

(15) John William Rook confessed in detail as to what he did and cooperated with the detectives and investigators of the Raleigh Police Department and Wake County Sheriff's Department as to his involvement.

(16) Any other circumstance or circumstances arising from the evidence which you, the jury, deem to have mitigating value.

cient and competent evidence. He also contends that the trial court erred in ruling that his confession was voluntary in that it was obtained by the influence of hope or fear implanted in his mind by the acts and statements of police officers during his custodial interrogation. Defendant also contends that his motion to suppress all evidence obtained as a result of the search warrant issued for the trailer on Stovall Street and the Mercury automobile should have been allowed because the record reveals insufficient facts or circumstances to support the finding of probable cause by the magistrate who issued the search warrant. Finally, defendant contends that his motion to dismiss the proceedings pursuant to G.S. 15A-2000 should have been allowed on the grounds that that section of our General Statutes is unconstitutional on its face and as applied to him. We discuss these contentions *seriatim*.

### A.

[1] As a result of defendant's motion to suppress his custodial statements, the trial court conducted an extensive voir dire hearing on the admissibility of the statements. Evidence was presented both by the State and defendant. Thereafter, the court entered extensive findings of fact and conclusions of law and denied the motion. With respect to the trial court's order, defendant first contends that certain findings of fact contained therein were not supported by substantial and competent evidence. We find no merit to this contention.

Defendant acknowledges the general rule in this jurisdiction that findings of fact made by the trial court following a voir dire hearing on the voluntariness of a confession are conclusive on appellate courts if supported by competent evidence in the record. *State v. Pruitt*, 286 N.C. 442, 212 S.E. 2d 92 (1975). No reviewing court may properly set aside or modify those findings if so supported. *State v. Barber*, 278 N.C. 268, 179 S.E. 2d 404 (1971). Indeed, a trial judge's findings will not be disturbed on appeal when the finding is supported by competent evidence even when there is conflicting evidence. *State v. McRae*, 276 N.C. 308, 172 S.E. 2d 37 (1970).

Here, the trial court found as a fact that "Lieutenant Benson advised the defendant that he was a G.D. liar, and then read a

warrant to the defendant charging him with murder and advised him that he was being charged with murder."

Defendant admits the truth of this finding but contends, however, that it is incomplete. Defendant argues that this finding should include a statement to the effect that Benson stated that "He had good evidence against him [the defendant] and that he didn't go down to the magistrate and get warrants for first degree murder without good evidence against him." Defendant contends that the finding made by the trial court is not a fair and clear statement of the events transpiring on the evening of 15 May 1980 absent the language he would add. We disagree. While there is some evidence from the defendant on voir dire which supports his contention as to events transpiring during the interrogation, other evidence before the trial court on voir dire supports the finding as stated. Indeed, Detective Holder flatly denied that Detective Benson told the defendant that he had "good evidence" implicating the defendant. Detective Holder testified, "At the time Freddie [Benson] left the room he did *not* say anything to him *other* than calling him a liar." [Emphasis added.] Hence, the trial court's finding was supported by competent evidence, and there was no error in the failure of the trial court to make the extended finding formulated by the defendant.

Defendant next contends that the following finding of fact was also not supported by competent evidence: "That Officer Benson spoke to the defendant in a loud but not an angry or threatening tone of voice." Defendant contends that the finding that the tone of voice used by Officer Benson during interrogation was not angry or threatening is not supported by evidence. Defendant primarily relies, in support of this argument, on the response of Detective Holder on cross-examination that, "Freddie Benson became very angry and upset at that time." We do not think the quoted testimony contradicts the trial court's finding that Benson's *voice* was not "angry or threatening." Immediately following the quoted testimony, Holder further testified that "Freddie Benson raised his voice. He didn't yell at him. He just raised his voice." Moreover, Benson himself testified that, "I used a loud tone of voice to tell him he was lying . . . I did not at any time threaten, make any promises or strike Mr. Rook when I was in the room." Immediately following this incident, Detective Benson left the room and took no further part in interrogation of the

defendant. Thus, the trial court's finding that Detective Benson's tone of voice was loud but not angry is supported by evidence and is binding on this Court.

Defendant next objects to the following finding of fact: "Holder advised the defendant that neither he nor Officer Lanier could help him and that the only thing that could help him was to tell the truth." Defendant contends that while there is conflicting evidence as to what Detective Holder did in fact tell the defendant concerning helping him, it is clear that the tenor of Holder's conversation with defendant prior to his confession was concern with giving him help for his drinking and drug problems. Defendant contends that Detective Holder "implicitly" promised to help the defendant. Again, we disagree. Even the defendant concedes that the evidence on this finding is "conflicting," and we find that the record reveals compelling evidence which supports the trial court's finding. Detective Holder testified:

> I told Johnny at that point, I said, Johnny, I can't help you. We cannot help you. The only thing that can help you is the truth. . . .
>
> I reemphasized the point that the only thing for him to do at that point was to tell the truth, that I could not help him, Mr. Lanier could not help him.
>
> . . . .
>
> . . . I told Johnny, I can't help you, Mr. Lanier cannot help you. The only thing that can help you is the truth. And that was it.
>
> . . . And, I told Johnny several times, I said Johnny, I can't help you.

Clearly, there is abundant evidence to support the trial court's finding.

Defendant next contends that the trial court erred in entering the following finding of fact:

> At no time did either officer advise or promise the defendant that he could or would be helped in court or with the District Attorney on the charges against him and offered no help to him with his alcoholic problems.

Defendant also contends that certain other findings similar to that quoted above regarding the offer of help to him with respect to his alcoholic problems are unsupported by evidence at the voir dire hearing. Defendant contends, as we address more fully in the next section of this opinion, that the evidence clearly shows that the defendant's confession was induced by an offer of help to keep him from receiving the death penalty and that, in return for confessing, he was told that he would be sent to prison where he would receive help for his drinking and drug problems. All findings to the contrary, defendant contends, are unsupported by the evidence.

There is simply no merit to defendant's contentions in this regard. The record is replete with testimony to support all of the trial court's findings that no offer of help was made to defendant in order to induce him to make his confession. For example, Detective Holder testified:

> I never offered or advised Mr. Rook that he could be helped in court. I never advised that he could be helped with the District Attorney's Office with respect to these charges.
>
> . . . Neither me nor Mr. Lanier offered to help Mr. Rook with his alcohol problem specifically. He seemed to understand that if he went back to prison he could get this help. We did not promise him any help at all. I did not make any promises with respect to the charges pending against him.
>
> .  .  .  .
>
> . . . I said, Johnny, is there anyone in this room, Mr. Lanier, myself and Miss Mobley, have they promised, have I promised or threatened you or put you under any pressure or coerced you in any way to make this statement. He said, no. . . .
>
> .  .  .  .
>
> No one during the course of the interview touched Mr. Rook's person in any threatened manner, strike him, or do anything of that nature to him.

We hold, therefore, that each of the challenged findings of fact is supported by competent evidence in the record and is binding on this Court. Moreover, we have examined the remaining findings

of fact in the order denying suppression of defendant's confession and find that each of them is supported by competent evidence adduced at the voir dire hearing. These assignments of error are overruled.

### B.

With respect to the trial court's order denying defendant's motion to suppress his custodial statements, defendant next contends that the trial court's findings of fact do not support its conclusion of law that his confession was voluntarily and understandingly made. Defendant contends that the circumstances of his confession were such that the confession was obtained by the influence of hope and fear implanted in his mind by the acts and statements of police officers during his custodial interrogation.

[2, 3] As noted in the preceding section of this opinion, facts found by the trial court are conclusive on appellate courts when supported by competent evidence. Nevertheless, the conclusions of law drawn from the facts found are not binding on the appellate court. *State v. Bishop*, 272 N.C. 283, 158 S.E. 2d 511 (1968). Hence, whether the conduct and language of the investigating officers amounted to such threats or promises or influenced the defendant by hope and fear as to render the subsequent confession involuntary is a question of law, as defendant contends, reviewable on appeal. *State v. Fox*, 274 N.C. 277, 163 S.E. 2d 492 (1968); *State v. Biggs*, 224 N.C. 23, 29 S.E. 2d 121 (1944). Even where the procedural safeguards required by *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed. 2d 694 (1968), are recited by the officers and defendant signs a waiver stating that he understands his constitutional rights, including his right to counsel, the ultimate test of the admissibility of a confession still remains whether the statement made by the accused was in fact voluntarily and understandingly given. The fact that the technical procedural requirements of *Miranda* are demonstrated by the prosecution is not, standing alone, controlling on the question of whether a confession was voluntarily and understandingly made. The answer to this question can be found only from a consideration of all circumstances surrounding the statement. *State v. Bishop*, 272 N.C. 283, 158 S.E. 2d 511; *accord, Davis v. North Carolina*, 384 U.S. 737, 86 S.Ct. 1761, 16 L.Ed. 2d 895 (1966); *State v. Pruitt*, 286 N.C. 442, 212 S.E. 2d 92.

**[4]**  Our inquiry, therefore, is whether the facts revealed by the record before us indicate that the challenged confession was obtained by the influence of hope or fear implanted in defendant's mind by the acts and statements of the police officers during defendant's custodial interrogation. The long-standing rule in this jurisdiction was stated by Chief Justice Taylor in *State v. Roberts*, 12 N.C. (1 Dev.) 259, 260 (1827):

> The true rule is, that a confession cannot be received in evidence, where the Defendant has been influenced by any threat or promise; for, as it has been justly remarked, the mind, under the pressure of calamity, is prone to acknowledge, indiscriminately, a falsehood or a truth, as different agitations may prevail; and therefore a confession obtained by the slightest emotions of hope or fear, ought to be rejected.

Justice Henderson, concurring, set forth the rule which we have followed since:

> Confessions are either voluntary or involuntary. They are called voluntary, when made neither under the influence of hope or fear, but are attributable to that love of truth which predominates in the breast of every man, not operated upon by other motives more powerful with *him*, and which, it is said, in the perfectly good man, cannot be countervailed. These confessions are the highest evidences of truth, even in cases affecting life. But it is said, and said with truth, that confessions induced by hope, or exhorted by fear, are, of all kinds of evidence, the least to be relied on, and are therefore entirely to be rejected. . . .

*Id.* at 261-62. In *State v. Pruitt*, 286 N.C. 442, 212 S.E. 2d 92, Justice Branch, now Chief Justice, noted the rules quoted above and summarized the numerous cases decided by this Court involving various factual backgrounds on this question. Here, defendant relies on *Pruitt* to support his contention that his confession was obtained by the influence of hope and fear. We think, however, that his reliance on *Pruitt* is misplaced. In *Pruitt*, the interrogation of defendant by three police officers took place in a "police-dominated atmosphere." The evidence was uncontradicted that the officers repeatedly told defendant that they knew he had committed the crime and that his story had too many holes in it; that

he was "lying" and that they did not want to "fool around." Such circumstances, this Court held, gave rise to the inference that the language used by the officers tended to provoke fright. Such language was then tempered by statements that the officers considered defendant the type of person "that such a thing would prey heavily upon" and that he would be "relieved to get it off his chest." These "flattering" statements were capped by the statement that "it would simply be harder on him if he didn't go ahead and cooperate." Justice Branch concluded, "Certainly the latter statement would imply a suggestion of hope that things would be better for defendant if he would cooperate, i.e., confess." *Id.* at 458, 212 S.E. 2d at 102.

Here, there is no evidence of any oppressive environment in the room where defendant was interviewed. It was a normal interview room at the Wake County Courthouse, approximately eight feet by fifteen feet, with a table and chairs and lighted by normal ceiling lights. Initially, there were three officers in the room when defendant was read his rights, but the evidence indicates that no more than one officer talked with him at a time. Detective Benson left the room shortly after the rights were read and Detective Holder became the sole questioner. Officer Lanier asked questions only after defendant had confessed. We have held on numerous occasions that a confession is not made inadmissible merely because it is made to officers of the law, or because defendant was in jail, or under arrest, or because it was given in response to questioning. *E.g., State v. Pruitt*, 286 N.C. 442, 212 S.E. 2d 92; *State v. Smoak*, 213 N.C. 79, 195 S.E. 72 (1938).

Moreover, there is no evidence that defendant was subjected to any threats or suggested violence or show of violence to persuade or induce him to make a statement. Indeed, the evidence that was presented showed that no threats were made to the defendant, nor was he touched or struck in any manner. As discussed in the preceding section of this opinion, there is ample and competent evidence to support the trial court's findings that "Officer Benson spoke to defendant in a loud but not angry or threatening tone of voice."

Defendant apparently relies primarily, in attacking the voluntariness of his confession, on the argument that he was "induced" to make his statement by an offer of "help" from Detective

Holder. As discussed in the preceding section of this opinion, however, we find competent evidence to support the trial court's finding that no such "help" was offered. Moreover, the record is clear that all talk of "help" emanated from the defendant himself. At each juncture when defendant mentioned that he "needed help" with his alcohol problem, Officer Holder was quick to tell him that he could not help him. The evidence overwhelmingly supports the trial court's finding of fact and conclusion of law that the officers did nothing to induce defendant's confession through hope or fear. The situation here is more similar to that in *State v. Small*, 293 N.C. 646, 239 S.E. 2d 429 (1977). In *Small*, the uncontradicted evidence showed that one of the officers had told the defendant that he could not "buy" one of defendant's statements and that defendant should tell the truth. This Court held that such statements "do not constitute a persuasive showing that defendant's will was overborne by these acts of the police officers." *Id.* at 653, 239 S.E. 2d at 435.

**[5]** Finally, we reiterate the rule stated in *Pruitt* that any improper inducement generating hope must promise relief from the criminal charge to which the confession relates, and not to any mere collateral advantage. Here, all discussions concerning any "help" for defendant were centered around defendant's drinking and family problems. Clearly, these are matters entirely collateral to the criminal charges against him.

This Court has consistently followed the rule enunciated by Justice Henderson in his *Roberts* concurrence. In *Pruitt*, we summarized numerous cases demonstrating this Court's adherence to that rule. We have made it equally clear, however, that custodial admonitions to an accused by police officers to tell the truth, standing by themselves, do not render a confession inadmissible. *State v. Thomas*, 241 N.C. 337, 85 S.E. 2d 300 (1955); *State v. Thompson*, 227 N.C. 19, 40 S.E. 2d 620 (1946); *State v. Thompson*, 224 N.C. 661, 32 S.E. 2d 24 (1944). Such custodial admonitions to tell the truth are all we find from the record before us. Here, as discussed in the preceding section of this opinion, there was ample evidence to support the trial judge's findings that defendant's confession was not coerced, and the findings in turn support his conclusion that the incriminating statement was made voluntarily and knowingly. We hold that the confession was properly admitted into evidence.

## C.

Prior to trial, defendant moved for the exclusion of all evidence obtained as a result of the search of the trailer where the defendant lived and all evidence obtained as a result of the search of the Mercury automobile on the ground that there was not probable cause for the issuance of the search warrant. The searches resulted in the seizure of certain bloody clothing which was introduced into evidence against defendant. Defendant attacks the search warrant in question on the grounds that (1) the application for the search warrant failed to contain sufficient facts and circumstances to indicate that the items sought constituted evidence of any crime, and (2) that the search warrant failed to contain sufficient facts or circumstances to indicate that the items would be in the trailer in question.

**[6]** These arguments are governed by well-established legal principles. The probable cause required by the fourth amendment and G.S. 15A-243-245 is simply:

> a reasonable ground to believe that the proposed search will reveal the presence, upon the premises to be searched, of the objects sought and that those objects will aid in the apprehension or conviction of the offender. [Citation omitted.] Thus, the affidavit upon which a search warrant is issued is sufficient if it "supplies reasonable cause to believe that the proposed search for evidence of the commission of the designated criminal offense will reveal the presence upon the described premises of the objects sought and that they will aid in the apprehension or conviction of the offender."

*State v. Riddick*, 291 N.C. 399, 406, 230 S.E. 2d 506, 511 (1976) (quoting *State v. Vestal*, 278 N.C. 561, 576, 180 S.E. 2d 755, 765 (1971), *cert. denied*, 414 U.S. 874 (1973)). *Accord, State v. Jones*, 299 N.C. 298, 303, 261 S.E. 2d 860 (1980). Whether probable cause exists for the issuance of a search warrant depends upon a practical assessment of the relevant circumstances, and each case must be decided on its own facts. Reviewing courts will pay deference to judicial determinations of probable cause, *Aguilar v. Texas*, 378 U.S. 108, 84 S.Ct. 1509, 12 L.Ed. 2d 723 (1964); *State v. Louchheim*, 296 N.C. 314, 250 S.E. 2d 630, *cert. denied*, 444 U.S. 836 (1979); "the resolution of doubtful or marginal cases in this area should be largely determined by the preference to be accord-

ed to warrants," *United States v. Ventresca*, 380 U.S. 102, 109, 85 S.Ct. 741, 746, 13 L.Ed. 2d 684, 689 (1965). A search warrant cannot be issued upon affidavits which are purely conclusory and which do not state underlying circumstances upon which the affiant's belief of probable cause is founded; there must be facts or circumstances in the affidavit which implicate the premises to be searched. *State v. Edwards*, 286 N.C. 162, 209 S.E. 2d 758 (1974); *State v. Campbell*, 282 N.C. 125, 191 S.E. 2d 752 (1972). With these principles before us, we review the search warrant and the affidavit upon which it was obtained.

[7] An examination of the application, prepared by Officer Bissette, indicates that the items sought included "a wooden club or instruments that could be used as a club, bloody clothing, and other instrumentalities of the crime," which was stated to be "rape, kidnapping, murder." In this connection, the application contained an affidavit from Officer Bissette which averred:

> On May 15, 1980, at 4:30 p.m., the vehicle, a 1972 Mercury, N.C. license #RAP-980, that the murder victim, Ann Marie Roche, was seen being forced into on May 12, 1980, was located at Stovall Drive Raleigh, N.C. The person in control of the vehicle, Ruby Howell, states that it is her mother's car and that she drives it and keeps it all the time. She states that on Monday, May 12, 1980, her neighbor, Johnny Rook, who lives at Lot 15, College View Trailer Park, 1508 Stovall Drive, borrowed the car at 5:45 p.m. and returned the car about two hours later. At the time he returned the car he had fresh cut marks on his face and blood on his arms. Johnny Rook is a white male with long blond hair that he wears in a pony tail. At the time he borrowed the car he was dressed in blue jeans and shoes only. . . . The murder victim was seen being forced into this car at 7:30 p.m. on Avent Ferry Road at Lake Raleigh Road by a white male wearing only blue jeans and shoes and using an object appearing to be a club to beat the victim. Her body was found on May 13, 1980 approximately one-fourth mile from this intersection nude with massive head and body injuries.

The information contained in this affidavit clearly establishes probable cause to believe that a "wooden club or instruments that could be used as a club" and "bloody clothing" constituted

evidence of the crimes being investigated, that a club, or an object appearing to be a club, was in the possession of defendant and was used as an instrumentality in committing the crimes being investigated, and that "bloody clothing" would constitute evidence of the offenses committed or would reveal the identity of a person participating in those offenses. Additionally, the items sought to be discovered were sufficiently described to enable officers to identify them.

Defendant argues, however, that the application for the search warrant failed to allege sufficient facts or circumstances which would indicate that the items sought would be discovered in the trailer to be searched. We disagree. The portion of the application dealing with this issue reads:

> Ruby Howell states . . . that on Monday, May 12, 1980, her neighbor, Johnny Rook, who lives in Lot 15, College View Trailer Park, 1508 Stovall Drive, borrowed her car at 5:45 p.m. and returned the car about two hours later. . . . At the time he borrowed the car he was dressed in blue jeans and shoes only. *She stated that after he returned the car he went to Lot 15, his residence in the park. He lives in this trailer* in the first bedroom on the right. The trailer is rented by Barry E. Staton. Johnny Rook has access to the entire trailer, according to a statement of Barry E. Staton. . . .

These facts or circumstances, in our opinion, supply reasonable cause to believe that the club-like object and the bloody clothing would be found on the premises to be searched.

The affidavit upon which the probable cause determination was based contained specific, and not purely conclusory, allegations and stated underlying circumstances upon which the affiant's belief of probable cause was founded. Clearly, there were facts and circumstances in the affidavit implicating the premises to be searched. A practical assessment of the information before the magistrate would clearly allow a reasonable person to conclude that the information contained in the application was credible and that the proposed search would reveal, upon the premises to be searched, the presence of the objects sought and that those objects would aid in the apprehension or conviction of the offender. Issuance of the search warrant by the magistrate on the

information available to him was, under the law of this State, clearly justified.

### D.

By this assignment defendant challenges the constitutionality of G.S. 15A-2000(e), the provision governing the submission of aggravating circumstances in the penalty phase of a first degree murder trial, both on its face and as applied in this case. The exceptions on which this assignment is based challenge the trial court's denial of defendant's pre-trial motion to dismiss the penalty phase proceedings and the trial court's entry of judgment imposing the death penalty upon the jury's recommendation.

[8] Defendant contends that the list of permissible aggravating circumstances violates the eighth and fourteenth amendments to the United States Constitution in that the circumstances listed are vague and overlapping and may cause the jury arbitrarily and capriciously to impose the death penalty. Defendant acknowledges that this Court has considered the issue of the constitutionality of G.S. 15A-2000(e) and has decided the issue adversely to him, *State v. Barfield*, 298 N.C. 306, 259 S.E. 2d 510 (1979), *cert. denied*, 448 U.S. 907 (1980), but requests that we reconsider that ruling. We are not so inclined.

In *Barfield*, the defendant challenged the constitutionality of the statutorily defined aggravating circumstances as "vague and without definition." In rejecting this claim this Court, per Justice Britt, noted:

> Sentencing standards are by necessity somewhat general. While they must be particular enough to afford fair warning to a defendant of the probable penalty which would attach upon a finding of guilt, they must also be general enough to allow the courts to respond to the various mutations of conduct which society has judged to warrant the application of the criminal sanction. *See Gregg v. Georgia*, 428 U.S. at 194-195, 49 L.Ed. 2d at 886-887, 96 S.Ct. at 2935. While the questions which these sentencing standards require juries to answer are difficult, they do not require the jury to do substantially more than is ordinarily required of a fact finder in any lawsuit. *See Proffitt v. Florida*, 428 U.S. at 257-258, 49 L.Ed. 2d at 926, 96 S.Ct. at 2969. The issues which

are posed to a jury at the sentencing phase of North Carolina's bifurcated proceeding have a common sense core of meaning. Jurors who are sitting in a criminal trial ought to be capable of understanding them and applying them when they are given appropriate instructions by the trial court judge. *See Jurek v. Texas*, 428 U.S. at 279, 49 L.Ed. 2d at 939, 96 S.Ct. at 2959 (White, J., concurring).

*Id.* at 353, 259 S.E. 2d at 543. We adhere to this reasoning and reaffirm our holding that the aggravating circumstances listed in G.S. 15A-2000(e) are not so vague as to violate due process or to allow a jury arbitrarily and capriciously to impose the death penalty. This assignment of error is overruled.

[9] Defendant specifically challenges the constitutionality of the statutory aggravating circumstance of the capital felony being "especially heinous, atrocious or cruel," G.S. § 15A-2000(e)(9) (1978), in that it requires a subjective evaluation of the evidence by the jurors. We disagree. This argument was rejected by this Court in *State v. Goodman*, 298 N.C. 1, 257 S.E. 2d 569 (1979). In *Goodman*, we recognized that while the United States Supreme Court has found a statute employing similar language to be unconstitutional because it allowed the jury too much latitude, *Gregg v. Georgia*, 428 U.S. 153, 96 S.Ct. 2909, 49 L.Ed. 2d 859 (1976), that Court has upheld similarly worded statutes whose meaning has been carefully limited by judicial construction, *Proffitt v. Florida*, 428 U.S. 242, 96 S.Ct. 2960, 49 L.Ed. 2d 913 (1978). Accordingly, in *Goodman* we interpreted our statutory aggravating circumstance of "heinous, atrocious or cruel" as " 'the conscienceless or pitiless crime which is unnecessarily torturous to the victim,' " *id.* at 25, 257 S.E. 2d at 585 (quoting *State v. Dixon*, 283 So. 2d 1, 9 (Fla. 1973), *cert. denied*, 416 U.S. 943 (1974)), the same interpretation approved by the United States Supreme Court in *Proffitt*, 428 U.S. at 255-56, 96 S.Ct. at 2968, 49 L.Ed. 2d at 924-25. Based on our reasoning in *Goodman* and that of the United States Supreme Court in *Proffitt*, we once again affirm the constitutionality of this aggravating circumstance.

Nor do we think that the trial court's instructions on this aggravating circumstance were so vague as to violate due process. With regard to this factor, the trial court told the jury:

Now, I instruct you, members of the jury, that in this context heinous, as that word is used, means extremely wicked or shockingly evil. Atrocious, as used there, means outrageously wicked and vile. And cruel means designed to inflict a high degree of pain with utter indifference to, or even enjoyment of the suffering of others.

However, it is not enough that this murder be heinous, atrocious or cruel, as those terms have just been explained to you, this murder must have been especially heinous, atrocious or cruel, and not every murder is especially so.

For this murder to have been especially heinous, atrocious or cruel, any brutality which was involved in it must have exceeded that which is normally present in any killing.

The murder must have been a conscienceless or pitiless crime which was unnecessarily torturous to the victim.

This instruction accords with the construction of G.S. 15A-2000(e)(9) adopted in *Goodman*, and its submission to the jury was proper on the evidence in this case. The evidence summarized in Section I of this opinion reveals the most gruesome murder imaginable and is sufficient to allow the jury to find that this was a "conscienceless or pitiless crime which was unnecessarily torturous to the victim."

Defendant further contends, however, that the decision of the United States Supreme Court in *Godfrey v. Georgia*, 446 U.S. 420, 100 S.Ct. 1759, 64 L.Ed. 2d 398 (1980), compels a reversal of our holding in *Goodman*. We disagree. In *Godfrey*, both victims died instantly from a gunshot wound to the head. The aggravating circumstance of the crime being "outrageously or wantonly vile, horrible or inhuman in that it involved torture, depravity of mind, or an aggravated battery to the victim," was submitted by the trial court and approved by the Georgia Supreme Court. The United States Supreme Court reversed the death sentence, holding that the Georgia Supreme Court had failed to be consistent in its interpretation of this aggravating circumstance. In earlier decisions, the Georgia Supreme Court had interpreted this aggravating circumstance to require a showing of torture or aggravated battery to the victim. In the case of the *Godfrey*

murders, the victims died instantly and the United States Supreme Court reasoned that "There is no principled way to distinguish this case, in which the death sentence was imposed, from the many cases in which it was not." *Id.* at 433, 100 S.Ct. at 1767, 64 L.Ed. 2d at 409.

This Court has avoided the problem presented by *Godfrey* by holding that this aggravating circumstance does not arise in cases in which death was immediate and in which there was no unusual infliction of suffering on the victim. *State v. Goodman,* 298 N.C. 1, 24-26, 257 S.E. 2d 569, 585; *accord, State v. Oliver and Moore,* 302 N.C. 28, 274 S.E. 2d 183 (1981). The instructions given by the trial judge here accorded with this interpretation and the evidence revealed by the record supports the submission of this aggravating circumstance to the jury. The record shows aggravated battery of the victim amounting to torture which necessarily caused her great physical pain and emotional distress. Thus, we hold that the instruction given complied with constitutional requirements and that the submission of the aggravating circumstance that the murder was especially heinous, atrocious or cruel was proper.

We conclude that the statutory scheme for determining the sentence in a capital case, G.S. § 15A-2000, is neither unconstitutional on its face nor as applied to this defendant.

## III.

### Guilt Phase

[10] Defendant next contends that the trial court erred in denying his motion to dismiss the charge of murder in the first degree based on premeditation and deliberation. In presenting this contention, defendant argues that the evidence from the pathologist and the defendant's statement establish (1) that Ms. Roche did not die immediately from any one blow or injury but from blood loss resulting from *all* of her injuries; (2) that the injuries to Ms. Roche's head were caused by defendant's hitting her with a tire tool; (3) that the injuries to her leg were caused by defendant's running over her with his automobile; and (4) that the exculpatory statements in his confession introduced by the State clearly established that he did not mean to strike Ms. Roche with the knife nor did he mean to run over her with the automobile. De-

fendant strongly urges that his own statement was the only evidence introduced by the State as to how Ms. Roche was injured and how she ultimately died and that there was no evidence contradictory to the defendant's statement that he did not mean to strike her with the knife or run over her. Hence, defendant argues that the State, by introducing his confession in which he claimed that the knife and automobile injuries were accidental, is bound entirely by the truth of such statements and that although the submission of the murder charge was proper under the felony murder rule, it was not proper under the theory of premeditation and deliberation. This is significant, defendant notes, because if submission of the murder charge were proper only under the felony murder rule, then rape should not have been submitted to the jury as an aggravating factor in the sentencing phase under *State v. Cherry*, 298 N.C. 86, 257 S.E. 2d 551 (1979), *cert. denied*, 446 U.S. 941 (1980). Had that aggravating factor not been submitted to the jury, defendant contends, the jury might possibly have found that the numerous mitigating circumstances outweighed the aggravating factors and would have recommended life imprisonment.

In presenting this argument, defendant is relying primarily on the principle of law enunciated by this Court in *State v. Carter*, 254 N.C. 475, 119 S.E. 2d 461 (1961). There, this Court stated:

> When the State introduces in evidence exculpatory statements of the defendant which are not contradicted or shown to be false by any other facts or circumstances in evidence, the State is bound by the statements. [Citations omitted.]

> And when the State's evidence and that of the defendant is to the same effect, and tend only to exculpate the defendant, his motion for judgment as of nonsuit should be allowed.

*Id.* at 479, 119 S.E. 2d at 464.

The principle has remained viable in this jurisdiction. Defendant has, however, ignored other rules which must be applied by this Court in reviewing the trial court's denial of the motion to dismiss. It is likewise the rule in this jurisdiction that the introduction by the State of a statement of the defendant which in-

cludes exculpatory assertions does not prevent the State from showing facts which contradict the exculpatory statements. Moreover, on motions to dismiss, only evidence favorable to the State is considered. *State v. Witherspoon,* 293 N.C. 321, 237 S.E. 2d 822 (1977). Put another way, the State is not bound by the exculpatory portions of a confession which it introduces if there is "other evidence tending to throw a different light on the circumstances of the homicide." *State v. Bright,* 237 N.C. 475, 477, 75 S.E. 2d 407, 408 (1953).

This Court answered a similar argument in *State v. May,* 292 N.C. 644, 235 S.E. 2d 178, *cert. denied,* 434 U.S. 928 (1977). There, it was said:

> Defendant assigns as error the failure of the trial court to enter judgment as of nonsuit at the close of all the evidence. Specifically, the defendant contends that he comes within the purview of the rules stated in *State v. Carter,* 254 N.C. 475, 479, 119 S.E. 2d 461, 464 (1961), that "[w]hen the State introduces in evidence exculpatory statements of the defendant which are not contradicted or shown to be false by any other facts or circumstances in evidence, the State is bound by these statements." *See also State v. Bolin,* 281 N.C. 415, 189 S.E. 2d 235 (1972). *However, the introduction by the State of an exculpatory statement made by a defendant does not preclude the State from showing the facts concerning the crime to be different, and does not necessitate a nonsuit if the State contradicts or rebuts the defendant's exculpatory statement. . . .*

*Id.* at 658, 235 S.E. 2d at 187 (emphasis added).

We find the emphasized portion of the rule cited from *May* applicable here. Crucial to defendant's contention is his insistence that the cause of Ms. Roche's death was injury suffered at his hands which he states in his confession he did not "mean to" inflict. He relies on the pathologist's testimony that all the injuries together caused her death to support his argument. A close reading of Dr. Copeland's testimony, however, indicates that he stated only that "none of the injuries taken together or acting singularly would have produced *immediate* death." (Emphasis added.) He also testified that the two injuries which were significantly severe to produce the blood loss causing death were the injuries

to the thigh due to the broken leg and the injuries to the head. There is nothing in the defendant's confession which implies that he did not intend to strike the victim about the head area with the tire tool, and defendant does not so contend on appeal. Indeed, defendant confessed to striking the victim with the tire tool prior to sexually assaulting her and that he continued to beat her thereafter. Defendant obtained the tire tool from the trunk of the vehicle because the victim was resisting defendant's sexual assaults, presumably to gain her submission. Such forethought and execution constitute premeditation and deliberation. It is clear from the pathologist's testimony that the injuries to the head area significantly contributed to the victim's blood loss and ultimate death and from defendant's own statement that these injuries were deliberately inflicted. This evidence, taken in the light most favorable to the State, sufficiently shows premeditation and deliberation to withstand defendant's motion to dismiss.

Other evidence gleaned from the record tends "to throw a different light on the circumstances of the homicide," *State v. Bright*, 237 N.C. at 477, 75 S.E. 2d at 408. Defendant's statement that he did not "mean to hit her" with the knife is contradicted by competent circumstantial evidence. From the placement, depth and straight lines of the cuts on the upper body, the pathologist concluded "that they were made in an *intentionally* superficial manner. . . . [Such a cut] is made deliberately shallow with some care and effort . . . ."

Moreover, physical evidence obtained by the officers from the murder scene substantially contradicts defendant's assertion that he did not "mean" to run over the victim. It is unnecessary to repeat that evidence here. Suffice it to say that the location of the victim's body in relation to the pile of clothing and the size of the field in which these brutal acts took place seriously challenge defendant's assertion that he accidentally ran over the victim.

In another case in which the defendant attacked the sufficiency of the evidence to support a jury finding of premeditation and deliberation, we recently stated:

In the instant case, the State presented evidence tending to show that defendant choked the deceased, pushed her out of the car, and ran over her several times. The requisite premeditation and deliberation could be inferred from the

brutal nature of the assault, the use of grossly excessive force or the "dealing of lethal blows after the deceased had been felled." [Citations omitted.] We hold that there was plenary evidence to support a jury finding that the defendant killed Ms. Grossnickle with premeditation and deliberation.

*State v. Ferdinando*, 298 N.C. 737, 741-42, 260 S.E. 2d 423, 426 (1979).

We hold, in the instant case, that the State submitted abundant evidence to support the trial court's denial of defendant's motion to dismiss the murder charge on the theory of premeditation and deliberation.

## IV.

### SENTENCING PHASE

Defendant assigns two errors to the sentencing proceedings. He first argues that the trial court erred in submitting the felony of rape as an aggravating circumstance during the sentencing determination phase and, secondly, that the trial court erred in failing to instruct the jury to indicate which of the mitigating circumstances it found to exist. We discuss these contentions *seriatim*.

### A.

[11] Defendant contends that the trial court erred in submitting the underlying felony of rape as an aggravating circumstance in his sentencing hearing and that he should not have been sentenced for the crime of rape even though the jury found him guilty of murder under both the theories of premeditation and deliberation and felony murder. We considered this question in *State v. Goodman*, 298 N.C. 1, 257 S.E. 2d 569 (1979), and held that when the defendant has been convicted of first degree murder on both the premeditation and deliberation and the felony murder theories, the inclusion of the underlying felony as an aggravating circumstance is proper. The commission of the "underlying" felony is not an essential element of the crime of premeditated murder and, thus, is not the "automatic" aggravating circumstance which we held in *Cherry* to be impermissible. *See State v. Cherry*, 298 N.C. 86, 257 S.E. 2d 551 (1979). Because this defendant was found guilty of first degree murder under both

theories, there was no error in submitting the rape as an aggravating circumstance.

Likewise, *Goodman* answers defendant's contention that he should not have been sentenced on the rape offense. There, we said:

> [D]efendant contends that he was improperly sentenced for the offenses of kidnapping and armed robbery as those offenses merged with the murder conviction. As we have already said, no merger of the felony occurs when the homicide conviction is based upon the theory of premeditation and deliberation. [Citation omitted.] Defendant was found guilty by virtue of premeditation and deliberation as well as by application of the felony-murder rule. Thus, the court could disregard the felony-murder basis of the homicide verdict and impose additional punishment upon defendant for the crimes of armed robbery and kidnapping.

*State v. Goodman*, 298 N.C. at 20, 257 S.E. 2d at 582. Here, therefore, the trial court properly sentenced defendant for the crime of rape. These assignments of error are without merit.

## B.

[12]  Defendant next contends that the trial court erred in failing to provide a space on the "Issues and Recommendation As to Punishment" form for the jury to list which of the specific mitigating circumstances it found or did not so find. Defendant believes that, since the aggravating factors must be specifically answered, the mitigating factors should be specified also. Defendant contends that failure to list which mitigating factors were found or not found impairs this Court's ability to give appropriate review to the sentencing phase of the case. While defendant makes a good argument that it is the better practice, and we agree, to require the jury to specify mitigating factors found and not found for the benefit of this Court in reviewing the appropriateness of the death penalty, we find no such requirement in our statutes.

G.S. 15A-2000, which sets out the procedures for the sentencing phase in a capital case, requires that the jury indicate in writing which of the statutory aggravating circumstances it finds beyond a reasonable doubt. G.S. § 15A-2000(c)(1) (1978). There exists no corresponding requirement regarding the mitigating cir-

cumstances considered by the jury. Instead, in recommending the death penalty the jury is required to state in writing only whether the mitigating circumstances found are insufficient to outweigh any aggravating circumstances found. G.S. § 15A-2000(c) (3) (1978). Thus, when this Court reviews the death sentence on appeal, we will have before us, by virtue of the requirements of the statute, a list of the aggravating circumstances submitted and those found, a list of the mitigating circumstances submitted, and a statement that any mitigating circumstances found are insufficient to outweigh the aggravating circumstances. Although some records presented to this Court have indicated which mitigating circumstances were found by the jury,[2] such information is not required to be presented by G.S. 15A-2000(d). Thus, if there exists a requirement of specific findings on the mitigating circumstances submitted, it must arise from a constitutional guarantee.

In *Gregg v. Georgia*, 428 U.S. 153, 96 S.Ct. 2909, 49 L.Ed. 2d 859 (1976), the United States Supreme Court upheld the Georgia statutory scheme for imposition of the death penalty in the face of a constitutional attack because, in its opinion, the Georgia procedure provided a reliable safeguard against arbitrary, excessive and disproportionate death sentences by limiting and guiding the jury's discretion and by providing automatic appellate review of all aspects of the sentencing.

The Georgia procedure is similar to our own statutory scheme. In Georgia courts, once guilt has been determined, the same jury (unless the jury is waived by the defendant) hears evidence concerning the circumstances of the crime and the criminal before making a recommendation as to the sentence. In reaching a sentence recommendation, the jury considers any mitigating circumstances and aggravating circumstances which it

---

2. The records in the following cases included specific findings on the mitigating circumstances submitted to the jury:

*State v. Hamlette*, 302 N.C. 490, 276 S.E. 2d 388 (1981); *State v. Silhan*, 302 N.C. 223, 275 S.E. 2d 450 (1981); *State v. Oliver and Moore*, 302 N.C. 28, 274 S.E. 2d 183 (1981); *State v. Small*, 301 N.C. 407, 272 S.E. 2d 128 (1980); *State v. Detter*, 298 N.C. 604, 260 S.E. 2d 567 (1979); *State v. Johnson*, 298 N.C. 355, 259 S.E. 2d 752 (1979); *State v. Spaulding*, 298 N.C. 149, 257 S.E. 2d 391 (1979); *State v. Cherry*, 298 N.C. 86, 257 S.E. 2d 551 (1979), *cert. denied*, 446 U.S. 941 (1980); *State v. Johnson*, 298 N.C. 47, 257 S.E. 2d 597 (1979); *State v. Goodman*, 298 N.C. 1, 257 S.E. 2d 569 (1979); *State v. Jones*, 296 N.C. 495, 251 S.E. 2d 425 (1979).

finds to exist. Georgia law does not enumerate what circumstances constitute mitigating factors but, instead, allows the jury to determine whether any facts proved at the sentencing hearing mitigate against imposition of the death penalty, limited only by the requirement that the mitigating circumstance be "authorized by law." Ga. Code Ann. § 27-2534.1 (1978). Furthermore, the trial court in its charge to the jury need not single out specific mitigating circumstances. *Spivey v. State*, 241 Ga. 477, 246 S.E. 2d 288, *cert. denied*, 439 U.S. 1039 (1978); *Potts v. State*, 241 Ga. 67, 243 S.E. 2d 510 (1978). With regard to mitigating circumstances, it is enough that the jury be told to "consider all evidence submitted in both phases of the trial in arriving at your verdict, including any and all evidence of mitigating circumstances." *Collier v. State*, 244 Ga. 553, 568-69, 261 S.E. 2d 364, 376 (1979), *cert. denied*, 445 U.S. 946 (1980). This is so even though aggravating circumstances must be submitted to the jury in writing. *Id.* Like the North Carolina statute, the Georgia statute requires the jury to return specific findings only as to the aggravating circumstances submitted. Ga. Code Ann. § 27-2534.1(c).

On appeal, the Georgia Supreme Court is required to review the sentencing procedure to determine:

(1) Whether the sentence of death was imposed under the influence of passion, prejudice, or any other arbitrary factor, and

(2) Whether, in cases other than treason or aircraft hijacking, the evidence supports the jury's or judge's finding of a statutory aggravating circumstance as enumerated in section 27-2534.1(b), and

(3) Whether the sentence of death is excessive or disproportionate to the penalty imposed in similar cases, considering both the crime and the defendant.

Ga. Code Ann. § 27-2537(c) (1978). Thus, because the Georgia statute requires specific findings only on aggravating circumstances, appellate review of the above-listed issues is limited to a consideration of the facts of the crime and the aggravating circumstances found by the jury.

As stated above, the United States Supreme Court has examined the Georgia procedure for imposition of the death penalty

and found it to be constitutional. *Gregg v. Georgia,* 428 U.S. 153, 96 S.Ct. 2909, 49 L.Ed. 2d 859. Our statutory scheme is strikingly similar to Georgia's, in that our sentencing review is limited to a consideration of the circumstances of the crime and the aggravating circumstances found by the jury. Georgia's scheme has been fully reviewed by the United States Supreme Court and has been declared constitutional; our statute is likewise constitutional. It follows, then, that there exists no constitutional requirement of specific findings on mitigating circumstances and that failure of the trial court to instruct the jury to make specific findings was not error.

We recognize that in Florida the jury, acting in a purely advisory role, must return specific findings as to both aggravating and mitigating circumstances regardless of what sentence it recommends and that the trial judge must make specific findings on both in writing before he determines the sentence. Fla. Stat. Ann. § 921.141 (Supp. 1980). This requirement, however, is imposed by the Florida statute and the Florida courts have never considered whether the deletion of the requirement for mitigating circumstances would render its procedure unconstitutional.

The State's contention is that it is unquestioned that our statutes and constitution require the jury specifically to indicate its finding on each aggravating circumstance submitted because such procedure provides an exercise of guided discretion to the jury. However, the State believes that the import of our previous decisions is that the jury should remain absolutely unfettered when it comes to considering mitigating circumstances. A requirement that the jury indicate its finding on each mitigating circumstance so submitted to them might, the State contends, unduly constrain the defendant. Requiring the jury to submit in writing which mitigating factors are found, may, the State argues, inhibit the jury and prevent them from considering "other mitigating circumstances." *See Collier v. State,* 244 Ga. 553, 261 S.E. 2d 364. The State's contentions in this respect are not without some persuasion.

We hold that a proportionality review which considers both the circumstances of the murder, the aggravating circumstances found by the jury and the mitigating circumstances submitted with those in other relevant cases satisfies constitutional re-

quirements and adequately protects against arbitrary, capricious, excessive or disproportionate imposition of the death penalty.

Even were we to accept defendant's argument, we perceive no prejudice to defendant here. Even assuming that the jury accepted all sixteen mitigating circumstances submitted as true,[3] we still could not conclude that the death sentence was arbitrary, excessive or disproportionate. The circumstances of this murder are cruel and gruesome almost beyond belief: a young female, a stranger to the defendant, was stopped while walking home in a residential area while it was still daylight. Almost immediately, defendant began beating her and pulling her around by her hair. He forced her into his car and drove to a deserted field. There, by his own admission, he beat her and cut her with a knife until he gained her submission. Then, he raped her and when he was through, left her to die from her wounds, slowly bleeding to death. The jury found that the aggravating circumstances outweighed the mitigating circumstances beyond a reasonable doubt. We are unable to disturb the jury's finding and to conclude otherwise. In summary, we find no statutory provision to support defendant's contention nor do we find such a constitutional requirement. Even if any authority could be found to support defendant's claim, his assignment would be of no avail because he is unable to demonstrate any prejudice whatsoever.

## V.

[13] In addition to the aggravating circumstance submitted to the jury as argued in Section IV A. of this opinion, we have also reviewed the other aggravating circumstances presented to the jury in view of the penalty imposed. We conclude that the trial court properly submitted each of these aggravating circumstances. *See State v. Barfield*, 298 N.C. 306, 259 S.E. 2d 510; *State v. Goodman*, 298 N.C. 1, 257 S.E. 2d 569; *State v. McDowell*, 301 N.C. 279, 271 S.E. 2d 286 (1980), *cert. denied*, 450 U.S. 1025, 101 S.Ct. 1731, 68 L.Ed. 2d 220 (1981).

G.S. 15A-2000(d) directs this Court to review the record in a capital case to determine whether the record supports the jury's finding of any aggravating circumstance, whether the sentence was imposed under the influence of passion, prejudice or any

3. See note 1 *supra*.

other arbitrary factor, and whether the sentence of death is excessive or disproportionate to the penalty imposed in similar cases, considering both the crime and the defendant. *State v. Martin*, 303 N.C. 246, 278 S.E. 2d 214 (1981); *State v. McDowell*, 301 N.C. 279, 271 S.E. 2d 286; *State v. Barfield*, 298 N.C. 306, 259 S.E. 2d 510. This mandate serves as a check against the capricious or random imposition of the death penalty. *State v. Hutchins*, 303 N.C. 321, 279 S.E. 2d 788 (1981). Our review function in this regard is limited to those instances where both phases of the trial of the defendant in a capital case have been found to be free from prejudicial error. *State v. Goodman*, 298 N.C. at 35, 257 S.E. 2d at 590-91. In exercising our role in the statutory scheme, we must be sensitive not only to the mandate of the Legislature, but also to the constitutional dimensions of our review. *See Gregg v. Georgia*, 428 U.S. at 204-206, 96 S.Ct. at 2939-2940, 49 L.Ed. 2d at 892-893; *Proffitt v. Florida*, 428 U.S. at 258-259, 96 S.Ct. at 2969-2970, 49 L.Ed. 2d at 926-927.

We consider the responsibility placed upon us by G.S. 15A-2000(d)(2) to be as serious as any responsibility placed on an appellate court. We have, therefore, carefully reviewed the record in this case along with the briefs and oral arguments presented. We conclude that there is sufficient evidence in the record to support the jury's finding as to the aggravating circumstances which were submitted to it. Moreover, as stated above, we find nothing in the record which indicates that the sentence of death was imposed under the influence of passion, prejudice, and any other arbitrary factor.

The record reveals that this defendant committed the most brutal, vile and vicious crime against Ann Marie Roche. Defendant beat Ms. Roche viciously with a tire tool, repeatedly cut her with a knife, ravaged her body in rape, ran over her battered body with an automobile and left her to bleed to death in a lonely field. Defendant's sadistic and bloodthirsty crimes committed against this victim compel the conclusion that the sentence of death is not disproportionate or excessive, considering both the crime and the defendant. We, therefore, decline to exercise our discretion to set aside the death sentence imposed.

In all phases of the trial below, we find

No error.

Justice EXUM concurring in part and dissenting in part.

I concur in the result reached by the majority on the guilt phase of this case. Being of the opinion, however, that it was prejudicial error for the trial court to permit the jury to return its recommendation for a sentence of death without specifying which of the mitigating circumstances it found to exist, I vote to remand the case for a new sentencing hearing. This practice violates G.S. 15A-2000 and seriously prejudices the defendant not only at trial but also on appeal when this Court is required to determine whether his capital sentence "was imposed under the influence of passion, prejudice, or any other arbitrary factor," or whether "the sentence of death is excessive or disproportionate to the penalty imposed in similar cases, considering both the crime and the defendant." G.S. 15A-2000(d)(2).

Properly read G.S. 15A-2000 requires the jury to indicate its findings as to each mitigating circumstance submitted to it. Although the statute does not expressly and specifically so require, when the statute is read contextually, it becomes clear that the legislature intended that the jury specify both the aggravating and mitigating circumstances which it finds to exist in a capital trial. It is our duty to construe G.S. 15A-2000 so that the result comports with the overall design and purpose of the statutory scheme even though the construction may go somewhat beyond the express language of the statute itself. *See, e.g., State v. Silhan*, 302 N.C. 223, 275 S.E. 2d 450 (1981); *State v. Cherry*, 298 N.C. 86, 257 S.E. 2d 551 (1979), *cert. denied*, 446 U.S. 941 (1980); *State v. Johnson*, 298 N.C. 47, 257 S.E. 2d 597 (1979); *State v. Goodman*, 298 N.C. 1, 257 S.E. 2d 569 (1979). We said in *State v. Johnson, supra*, 298 N.C. at 56, 257 S.E. 2d at 606, with reference to G.S. 15A-2000:

"We must *construe* important provisions of the statute. The first maxim of statutory construction is to ascertain the intent of the legislature. To do this this Court should consider the statute as a whole, the spirit of the statute, the evils it was designed to remedy, and what the statute seeks to accomplish." (Emphasis original.)

Section (b) of the statute requires, first, that in all capital cases:

"[T]he judge shall include in his instructions to the jury that it must consider any aggravating circumstance or circumstances or mitigating circumstance or circumstances from the lists provided in subsections (e) and (f) which may be supported by the evidence, *and shall furnish to the jury a written list of issues relating to such aggravating or mitigating circumstance or circumstances.*

"After hearing the evidence, argument of counsel, and instructions of the court, the jury shall deliberate and render a sentence recommendation to the court, based upon the following matters:

(1) Whether any sufficient aggravating circumstance or circumstances as enumerated in subsection (e) exist;

(2) Whether any sufficient mitigating circumstance or circumstances as enumerated in subsection (f), which outweigh the aggravating circumstance or circumstances found, exist; and

(3) Based on these considerations, whether the defendant should be sentenced to death or to imprisonment in the State's prison for life." (Emphasis supplied.)

Section (c) provides:

"(c) Findings in Support of Sentence of Death.—When the jury recommends a sentence of death, the foreman of the jury shall *sign a writing* on behalf of the jury *which writing* shall show:

(1) The statutory aggravating circumstance or circumstances which the jury finds beyond a reasonable doubt; and

(2) That the statutory aggravating circumstance or circumstances found by the jury are sufficiently substantial to call for the imposition of the death penalty; and,

(3) That the mitigating circumstance or circumstances are insufficient to outweigh the aggravating circumstance or circumstances found." (Emphasis supplied.)

Section (e) then lists the available aggravating circumstances, and section (f) suggests a number of mitigating circumstances which the jury may consider but to which it is not limited because of the open-ended language found in section (f)(9).

The statute thus requires that "a written list of issues relating to" the aggravating and mitigating circumstances be submitted to the jury. The jury, before it may recommend a sentence of death, must specify in writing which aggravating circumstances it finds beyond a reasonable doubt; that these circumstances are sufficiently substantial to call for the imposition of the death penalty, and that the mitigating circumstances are insufficient to outweigh the aggravating circumstances. Thus, as we noted in *State v. Johnson, supra,* 298 N.C. 47, 257 S.E. 2d 597, the statutory process is, as it must be, "directed toward the jury's having a full understanding of both the relevant aggravating and mitigating factors and the necessity of balancing them against each other in determining whether to impose the death penalty." *Id.* at 63, 257 S.E. 2d at 610.

Since the mitigating circumstances are required to be submitted, like the aggravating circumstances, to the jury in the form of "written . . . issues" and the jury is required to find whether "sufficient" aggravating and "sufficient" mitigating circumstances exist and since the jury is further required to show in writing which of the aggravating circumstances it finds, the conclusion is inescapable that the legislature intended the jury should also be required to show in writing which of the mitigating circumstances it finds to exist. What other purpose would there be for submitting the mitigating circumstances to the jury on a written list? To require both the mitigating and aggravating circumstances to be submitted in the form of "written . . . issues" clearly imports a legislative intent that the jury consider and answer them as such. The very term "Issues" as applied to a trial generally refers to factual or legal questions *which must be answered* in order to resolve the dispute. If the issues are factual they are resolved by the trier of fact. "An 'issue' is a disputed point or question . . . upon which [parties to an action] are desirous of obtaining either decision of court on question of law or of court or jury on question of fact." Black's Law Dictionary (5th ed. 1979).

To require the jury to indicate in writing the mitigating circumstances it finds to exist has been the practice followed by our

trial judges in every case tried under the new death penalty statute which has been determined by this Court and in which the jury recommended death except for the instant case; *State v. Taylor*, decided this day and in which I also dissent in part; and *State v. Hamlette*, 302 N.C. 490, 276 S.E. 2d 388 (1981).[1] The cases are: *State v. Irwin*, No. 26, Fall Term 1981, presently pending in the Court; *State v. Hutchins*, 303 N.C. 321, 279 S.E. 2d 788 (1981); *State v. Martin*, 303 N.C. 246, 278 S.E. 2d 214 (1981); *State v. Silhan, supra*, 302 N.C. 223, 275 S.E. 2d 450; *State v. Oliver and Moore*, 302 N.C. 28, 274 S.E. 2d 183 (1981); *State v. Small*, 301 N.C. 407, 272 S.E. 2d 128 (1980); *State v. McDowell*, 301 N.C. 279, 271 S.E. 2d 286 (1980), *cert. denied*, --- U.S. ---, 101 S.Ct. 1731, 68 L.Ed. 2d 220 (1981); *State v. Detter*, 298 N.C. 604, 260 S.E. 2d 567 (1979); *State v. Johnson*, 298 N.C. 355, 259 S.E. 2d 752 (1979); *State v. Barfield*, 298 N.C. 306, 259 S.E. 2d 510 (1979), *cert. denied*, 448 U.S. 907 (1980); *State v. Spaulding*, 298 N.C. 149, 257 S.E. 2d 391 (1979); *State v. Cherry, supra*, 298 N.C. 86, 257 S.E. 2d 551, *cert. denied*, 446 U.S. 941; *State v. Johnson, supra*, 298 N.C. 47, 257 S.E. 2d 597; *State v. Goodman, supra*, 298 N.C. 1, 257 S.E. 2d 569; *State v. Jones*, 296 N.C. 495, 251 S.E. 2d 425 (1979). Presumably our trial judges in these cases were following the statutory requirements as they understood them to be. This is a strong indicator that the statute should be interpreted to accord with the practice which has evolved pursuant to its provisions particularly when such an interpretation is the more reasonable one when the statute is considered as a whole.

Furthermore this Court has determined that the defendant must prove each mitigating circumstance which he proffers by the greater weight of the evidence and that upon his timely request he is entitled to a peremptory instruction in his favor where "all of the evidence in the case, if believed, tends to show that a particular mitigating circumstance does exist." *State v. Johnson, supra*, 298 N.C. at 76, 257 S.E. 2d at 618. Surely this holding contemplates a statute which requires not only that a written list of mitigating circumstances be submitted, but that the jury indicate on the list its findings as to each such circumstance submitted.

---

1. In *Hamlette*, however, no specific mitigating factors were proffered. Only the catchall section (f)(9) was used and the jury answered it "none."

Requiring the jury to specify in writing the aggravating, but not the mitigating, circumstances which it finds to exist not only violates G.S. 15A-2000, but it also prejudices the defendant at the sentencing hearing. It encourages the jury to think that the mitigating circumstances are less worthy of consideration than the aggravating circumstances. Under this practice the jury is not required, as it should be, to focus its full attention on each submitted mitigating circumstance individually in order to determine whether it exists. Yet this kind of determination is necessarily prerequisite to the jury's determination whether the mitigating circumstances "are insufficient to outweigh the aggravating circumstances." The danger in not requiring the jury to specify its findings regarding the individual mitigating circumstances is that the jury will not, because it thinks it need not, decide which mitigating circumstances it believes do in fact exist, but will simply determine amorphously that whatever the mitigating circumstances may be, they do not outweigh the aggravating circumstances. This kind of determination fails to give a defendant the benefit of a particularized consideration of each circumstance which might militate against putting him to death.

Such a determination probably violates a capital defendant's constitutional right to "individualized consideration" as that concept was expounded in *Lockett v. Ohio*, 438 U.S. 586, 604-05 (1978) (Burger, C.J.; plurality opinion):

"[T]he Eighth and Fourteenth Amendments require that the sentencer, in all but the rarest kind of capital case, not be precluded from considering *as a mitigating factor*, any aspect of a defendant's character or record and any of the circumstances of the offense that the defendant proffers as a basis for a sentence less than death. . . . The need for treating each defendant in a capital case with that degree of respect due the uniqueness of the individual is far more important than in non-capital cases. . . . The nonavailability of corrective or modifying mechanisms with respect to an executed capital sentence underscores the need for individualized consideration as a constitutional requirement in imposing the death sentence.

"There is no perfect procedure for deciding in which cases governmental authority should be used to impose

death. But a statute that prevents the sentencer in all capital cases from giving independent mitigating weight to aspects of the defendant's character and record and to circumstances of the offense proffered in mitigation creates the risk that the death penalty will be imposed in spite of factors which may call for a less severe penalty. When the choice is between life and death, that risk is unacceptable and incompatible with the commands of the Eighth and Fourteenth Amendments." (Emphasis original.)

Under our statutory scheme permitting the jury to return a recommendation for death without requiring it to specify which mitigating circumstances it finds to exist so dilutes the jury's constitutional duty to consider, in the words of *Lockett*, "any aspect of a defendant's character or record and any of the circumstances of the offense that defendant proffers as a basis for a sentence less than death" and to give them "independent mitigating weight" that it skirts dangerously close to violating these constitutional requirements.

The majority relies on *Gregg v. Georgia*, 428 U.S. 153 (1976) to sustain its interpretation of our statute against constitutional attack. I believe the reliance is misplaced. Our statutory scheme for imposing the death penalty and that of Georgia's are quite different. Our statute not only suggests a list of mitigating circumstances which might be proffered by the defendant but it requires that the list be submitted to the jury in writing along with a written list of the aggravating circumstances. The Georgia statute permits the jury to consider any mitigating factor but none of these factors are enumerated, specified, or otherwise suggested to the jury. Ga. Code Ann. § 27-2534.1. Under our statute, as I have noted, the jury is required to balance carefully various *enumerated* mitigating circumstances with various *enumerated* aggravating circumstances submitted in the form of written issues in determining whether to recommend a sentence of death or life imprisonment. Under Georgia law the jury "is not required to find any mitigating circumstance in order to make a recommendation of mercy that is binding on the trial court . . . but it must find a *statutory* aggravating circumstance before recommending a sentence of death." *Gregg v. Georgia, supra*, 428 at 197. (Emphasis original.) Indeed, in Georgia, the jury may return a death sentence upon finding one or more aggravating circumstances, no

State v. Rook

matter how it regards the mitigating circumstances.[2] In contrast, under our statute the jury may return a death sentence recommendation only if it finds: (1) the existence of one or more aggravating circumstances; (2) that the aggravating circumstance(s) found by it are sufficiently substantial to call for the imposition of the death penalty; and (3) that *the mitigating circumstances are insufficient to outweigh the aggravating circumstances*. The clear import of our statute is that a jury, upon finding the requisite existence of aggravating circumstances and their sufficient substantiality, may not recommend life imprisonment unless it further finds that the mitigating circumstances are sufficient to outweigh the aggravating circumstances.

Under our statute the jury's sentence determination is far more carefully channeled. The entire thrust of our statute is directed toward insuring that the jury fully understand *both* the aggravating *and* mitigating circumstances so that it may carefully balance them against each other in arriving at its sentence determination. *State v. Johnson, supra,* 298 N.C. 47, 257 S.E. 2d 597. Thus the existence or non-existence of mitigating circumstances looms far more crucial to the jury's ultimate determination under our statute than it does under Georgia's. For this reason the majority's conclusion that our statute does not require the jury to answer specifically the written issues relating to mitigating factors but only those relating to aggravating factors may well render the statute violative of the constitutionally required individualized consideration in a capital case even though Georgia's procedure was sustained in *Gregg*. For the jury here is given both lists of aggravating and mitigating issues, in writing, told to answer the issues relating to aggravating factors in writing, and then told to make its life or death decision on the basis of what is essentially a careful balancing of the aggravating against the mitigating circumstances. Yet at the same time the jury is told that it really should not answer in writing the individual issues relating to mitigating circumstances. This procedure is bound to diminish in the jury's mind the importance of its determination with regard to each mitigating factor submitted, a determination which, under our statute, is crucial to its ultimate decision. It

2. Ga. Code Ann. § 27-2534.1. The judge or jury is required simply "to consider any mitigating circumstances." *Id.*

makes it less likely, and I believe unconstitutionally so, that the jury will find the mitigating circumstances sufficient to outweigh the aggravating. Indeed, it makes it less likely that the ultimate sentence determination will be based on that kind of individualized determination that our statute contemplates and the constitution requires.

Furthermore, not requiring the jury to specify which mitigating circumstances it finds to exist prejudices the defendant's ability to obtain that review of his sentence required by G.S. 15A-2000(d)(2), sometimes referred to as our proportionality review, unless the Court is willing to sustain the sentence upon the assumption that the jury answered all mitigating circumstances[3] submitted to it in favor of the defendant. The majority here is apparently willing to sustain this sentence even after making that assumption. I could not vote to sustain the death sentence if the jury had answered all mitigating circumstances in defendant's favor. If this had happened, I, for reasons hereinafter stated, would vote to remand for the imposition of a sentence of life imprisonment, although I, like the majority, am repulsed by the gruesome circumstances of defendant's crimes. Since I cannot on this record know how the jury answered these issues, I must, for this additional reason, vote to remand for a new sentencing hearing at which the jury would be directed to give its answers to these issues.

The statute mandates that we consider whether "the sentence of death is excessive or disproportionate to the penalty imposed in similar cases, considering both the crime *and the defendant*." G.S. 15A-2000(d)(2). (Emphasis supplied.) Obviously the statute contemplates that we compare not only the circumstances under which the crime was committed but that we also look to the nature, character, and background of the defendant committing it. I have already noted the stress which the United States Supreme Court in *Lockett v. Ohio, supra,* 438 U.S. 586, placed on the "need for treating each defendant in a capital case with that degree of respect due the uniqueness of the individual" and "the need for individualized consideration as a constitutional requirement in imposing the death sentence." Generally the mitigating circumstances proffered by a defendant in a capital case will per-

---

3. These circumstances are listed in the majority opinion at n. 1.

tain to his individual character, personal history, mental and emotional stability, and background; while the aggravating circumstances generally relate to the circumstances of the crime itself. We cannot, therefore, determine whether the sentence of death in any particular case is excessive or disproportionate when compared with similar cases "considering both the crime and the defendant" unless we know both the aggravating and the mitigating circumstances found by the jury to exist. This is particularly true with two of the mitigating circumstances submitted in this case, *i.e.*, that the murder was committed while the defendant "was under the influence of mental or emotional disturbance" and that the capacity of the defendant "to appreciate the criminality of his conduct or to conform his conduct to the requirements of the law was impaired." G.S. 15A-2000(f)(2) and (6).

An examination of capital cases so far determined by this Court reveal that jury determinations with regard to the existence of these two mitigating circumstances is perhaps the most crucial factor in the jury's ultimate recommendation. In every case in which the jury rejected both of these circumstances, the jury has returned a death sentence recommendation. *Detter, Barfield, Martin, Cherry* and *Irvin.* In the five cases in which the jury considered only one of these mitigating circumstances and rejected it, the jury recommended death in three, *Jones, Goodman,* and *Small,* and life in two. *Crews* and *Atkinson.*[4] On the other hand, of the eleven cases in which either or both of these mitigating circumstances were submitted and answered affirmatively by the jury, *Turpin, Johnson* I, *Spaulding, Poole, Johnson* II, *Taylor, Ferdinando, Myers, King, Adcox,* and *Hutchins,*[5] the jury returned a recommendation for life imprisonment in all but

4. All the listed cases are cited previously except *State v. Atkinson,* 298 N.C. 673, 259 S.E. 2d 858 (1979); *State v. Crews,* 296 N.C. 607, 252 S.E. 2d 745 (1979).

5. All the listed cases are cited previously except *State v. Adcox,* 303 N.C. 133, 277 S.E. 2d 398 (1981); *State v. King,* 301 N.C. 186, 270 S.E. 2d 98 (1980); *State v. Myers,* 299 N.C. 671, 263 S.E. 2d 768 (1980); *State v. Ferdinando,* 298 N.C. 737, 260 S.E. 2d 423 (1979); *State v. Taylor,* 298 N.C. 405, 259 S.E. 2d 502 (1979); *State v. Poole,* 298 N.C. 254, 258 S.E. 2d 339 (1979); and *State v. Crews,* 296 N.C. 607, 252 S.E. 2d 745 (1979) (also reviewing defendant Turpin's trial).

In *State v. Crawford,* 301 N.C. 212, 270 S.E. 2d 102 (1980), the two mitigating factors were not submitted, but the jury nevertheless found that "the financial and emotional burdens and hardships created by his children" were a mitigating circumstance; and it recommended life imprisonment.

four cases, *Johnson* I, *Spaulding*, *Johnson* II and *Hutchins*. Of these four, however, *Johnson* I and *Johnson* II were remanded for a new sentencing hearing because of improper instructions on the diminished capacity circumstance. At the new sentencing hearings in both cases, at which presumably appropriate instructions were given, the juries returned a life imprisonment recommendation. Furthermore *Spaulding* was remanded for a new trial for errors committed in the guilt phase. At Spaulding's retrial life imprisonment was imposed because the jury was unable to reach a unanimous verdict. Consequently of the eleven cases in which either or both of these mitigating circumstances were found in defendant's favor, only one of the defendants, Hutchins, received a death sentence which was ultimately affirmed by this Court. In Silhan's first trial, *State v. Silhan*, *supra*, 302 N.C. 223, 275 S.E. 2d 450, neither of these mitigating circumstances was submitted to the jury and the jury recommended the death sentence. On retrial, however, both circumstances were submitted. The jury rejected the impaired capacity circumstance and found the emotional disturbance circumstance to exist. The jury then being unable to agree, the judge as required by G.S. 15A-2000(b) imposed a sentence of life imprisonment.[6]

This analysis demonstrates that juries in North Carolina almost never recommend the death penalty after they determine that at the time of the crime the defendant was either under the influence of mental or emotional disturbance or that his capacity to appreciate the criminality of his conduct and to conform his conduct to law was impaired. Likewise this Court should be slow to affirm a death sentence in which these mitigating circumstances are present. The law's humanity would seem to dictate that rarely if ever should death be the appropriate punishment for a defendant who kills under the influence of a mental or emotional disturbance and whose capacity to appreciate the wrongness of his act and to conform his conduct to the requirements of law is impaired. Punished he should be. But execution of a defendant whose crime is the product of a mentally and emotionally defective personality and who suffers from an incapacity to con-

---

6. *State v. Silhan*, No. 79-CRS-1943, 81-17-259 (Columbus Superior Court). With respect to all the North Carolina capital cases discussed in this dissent, information not found in the opinions of this Court may be found in the records on appeal or from the appropriate superior court clerks.

trol his conduct is excessively vindictive. It marks society itself with the same kind of unnecessary barbarity which it claims to be punishing in the defendant. The death penalty, if we are to have it at all, should be reserved for first degree murders which are the products of the meanness of mature, calculating, fully responsible adults.

John Rook, *if* the jury answered all the mitigating circumstances in his favor, would not be that kind of defendant. His evidence presented at the sentencing phase included the testimony of family members and two psychiatrists. Rook, age 21 at the time of the offense, was the product of an abnormally deprived, if not depraved, childhood. Both parents were alcoholics. His father began to give him alcoholic beverages at the early age of three years because he enjoyed watching him become intoxicated. His father regularly and without provocation required Rook to undress and submit to severe beatings. Early in his life Rook began to use alcohol on a regular basis and later became a regular user of a multitude of various illegal drugs such as cocaine, marijuana, and speed. Rook spent much of his early teenage years in juvenile detention facilities, but his problems stemmed from his addiction to alcohol and drugs. When he was not under the influence of these substances he was a loving and affectionate husband and brother. On the date of the offense in question Rook was under the influence of both alcohol and drugs. According to the psychiatrists who testified he was under the influence of a mental and emotional disturbance at the time of the crime and was unable to appreciate the criminality of his conduct or to conform his conduct to the requirements of law. He expressed remorse for his actions to both psychiatrists who examined him and he ultimately cooperated fully with investigators after acknowledging to them that he needed help.

This evidence formed the basis for most of the mitigating circumstances submitted to the jury for its determination. If we assume that the jury answered these mitigating circumstances in defendant's favor, it accepted this evidence as true.

Only three aggravating circumstances were submitted to the jury. Other than the circumstance that the murder was especially heinous, the only other aggravating circumstances were the rape and the kidnapping of the murder victim herself. But if the jury

answered the mitigating circumstances in defendant's favor, these crimes, like the murder, were the products of defendant's mental and emotional disturbance and his diminished capacity to appreciate their criminality and to conform his conduct to the requirements of law. If defendant's evidence is believed the whole awful incident is, really, attributable to the tragic personality defects traceable to a depraved childhood of a young, immature, mental defective spurred on by the influence of alcohol and drugs.

Of the capital cases so far determined by this Court, then, Rook would be the only defendant other than Spaulding and Hutchins for whom the jury after answering upon proper instructions the emotional disturbance or diminished capacity issue in defendant's favor also recommended death. As earlier noted, on Spaulding's second trial the jury could not agree on the sentence, and a life sentence was ultimately imposed. Yet Rook, from the standpoint of his background, is far more deserving of mercy than Spaulding or Hutchins. Spaulding was a mature adult who at the time of the murder in question was already serving a life sentence for two prior murders. Records and Briefs, Spring Term 1979, No. 10, p. 127. Hutchins was also a mature adult.[7] He was convicted by the jury of murdering one after the other three law enforcement officers, all of whom were attempting to apprehend him. The killings were apparently the product of Hutchins' blind rage. Although he contended he suffered from paranoid psychosis, only one mitigating circumstance was answered by the jury in Hutchins' favor, i.e., that he was under the influence of a "mental or emotional disturbance." The jury rejected Hutchins' proffered circumstance that his capacity to appreciate the criminality of his act or to conform his conduct to law was diminished. It also concluded that there were no other unspecified mitigating circumstances in his case.

If we assume the jury believed Rook's evidence in mitigation and answered all mitigating circumstances in his favor, he would be the first defendant finally sentenced to die who at the time of the murder was under the influence of a mental and emotional

---

7. I dissented in Hutchins and voted to give him a new trial on the merits because of an irreconcilable conflict between him and his trial counsel, a conflict which I also believed probably contributed to the jury's ultimate recommendation of death.

disturbance *and* whose capacity to appreciate the criminality of his conduct or to conform his conduct to law was impaired. Considering this, and considering the many other mitigating circumstances submitted in his favor, *e.g.*, his age, depraved childhood, subnormal intelligence, alcoholism and drug addiction, cooperation with investigators, and the fact that this awful incident is totally out of character for him when he is not under the influence of drugs and alcohol, I would have to conclude that the sentence of death recommended by the jury was disproportionate to the penalty imposed in similar cases considering both the crime and the defendant. My vote would then be to remand the case for the imposition of a sentence of life imprisonment.

Since I cannot know how much of defendant's evidence in support of his proffered mitigating circumstances the jury accepted in view of the jury's failure to answer these issues, I vote to remand the case for a new sentencing hearing at which these issues would be answered.